**Mya LWIN, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 97–2490.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 28, 1998.

Decided May 15, 1998.

Douglas P. Martin (argued), Altheimer & Gray, Chicago, IL, Sioban Albiol, Midwest Immigrant Rights Center, Chicago, IL, for Petitioner.

Samuel Der-Yeghiayan, Immigration & Naturalization Service, Chicago, IL, Kristal A. Marlow, Michelle Gluck, Stephen W. Funk (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before ESCHBACH, MANION, and KANNE, Circuit Judges.

MANION, Circuit Judge.

Mya Lwin, a Burmese national, is the father of a student dissident who fled Burma in the wake of the military junta's crackdown on pro-democracy uprisings in 1988. Despite orders from the police that he report any contact with his son, Mya continued to maintain unauthorized communications with him, first when his son reached Thailand and later after his son made his way to the United States. Mya visited his son in the United States and then applied for political asylum and withholding of deportation. The Immigration Judge (IJ) denied Mya's application, and that decision was upheld by the Board of Immigration Appeals (BIA or Board). Mya contends that the BIA erred by holding that he did not establish either past persecution or a well-founded fear of future persecution on account of political opinion or membership in a particular social group. We affirm in part, and vacate and remand in part.

## I. Procedural Background

Mya Lwin, now in his late fifties, entered the United States on a visitor's visa in February 1995 and overstayed. In August 1995, he applied pro se for asylum and withholding of deportation under §§ 208(a) and 243(h) of the Immigration and Nationality Act (INA). 8 U.S.C. §§ 1158(a) & 1253(h). Shortly afterwards, the Immigration and Naturalization Service initiated deportation proceedings against him under § 241(a)(1)(C)(I) of the INA. 8 U.S.C. § 1251(a)(1)(C)(I). Mya conceded deportability. With the help of counsel, Mya supplemented his asylum application with affidavits, as well as international human rights reports and news clippings documenting Burma's political conditions. In a supplemental statement, Mya clarified that his asylum claim was based on his well-founded fear of persecution due to (1) the political opinions of his son that would be imputed to him, and (2) his membership in a particular social group, namely, parents of Burmese student dissidents.

A hearing followed at which both Mya (whom the IJ found to be "basically credible") and his activist son, Thant Lwin, testified about the circumstances surrounding Mya's fear of persecution. In May 1996, the IJ denied Mya's requests for asylum and withholding of deportation. The IJ explained that Mya had failed to demonstrate that he was persecuted on account of any imputed political opinion. The IJ did not mention Mya's social group claim. Mya appealed to the BIA, which summarily affirmed.

## II. Factual Background

Authoritarian military regimes have ruled Burma throughout most of Mya's adult life. From 1962 to 1988, a strong-arm general, Ne Win, presided over a repressive state that suppressed all forms of internal dissent or rebellion. In late 1987, an unpopular demonetization decree followed by episodes of police brutality incited massive, widespread protests led by university students. Throughout the spring of 1988, police clashed with protesters. Thant Lwin, a Rangoon University student, was one of the protesters. Thant gave speeches and organized

demonstrations for the All-Burma Federation of Students' Union, the country's largest student organization.

In June 1988, police arrested Thant for participating in protests organized by Rangoon University students. Police interrogated him for two days, releasing him only after he promised not to participate in the movement or contact other demonstrators. Thant then went underground. For a time, he supplied reports to the British embassy about the demonstrations. But as the protests mounted and the political climate grew more chaotic, Thant began to fear reprisal for his activism. He fled into the jungles near the Thai border on September 16, 1988. On September 18, a military junta, the State Law and Order Restoration Council (SLORC), regained direct control over the government.[1] The following day, SLORC ordered a brutal crackdown on protesters that left hundreds of persons dead. Thant meanwhile escaped to Bangkok. In 1991, he was admitted into the United States as a refugee under § 207 of the INA. 8 U.S.C. § 1157.

After Thant's escape, military officials twice interrogated Mya and his wife about their son's whereabouts. The first interrogation occurred in November 1988, and the second in April 1990. Although Mya had already received letters from Thant stating that he was in Bangkok, Mya did not disclose his son's location. At the end of the second interrogation, Mya signed a statement promising to report any communication received from his son. Between 1988 and 1990, village and police officials searched the Lwins' home on three occasions.

Several years later, Thant, who ended up in Fort Wayne, Indiana, contacted his father and invited him to visit. Mya obtained a passport under the pretense of making a business trip, and traveled to Bangkok, where the American embassy helped arrange a visa for him to visit Thant in the United States. Mya arrived in the United States in February 1995.

After his arrival, Mya sent his wife a letter enclosing a photograph of himself, Thant, and Thant's newborn daughter. But the letter never arrived, so presumably the government authorities intercepted it. That was corroborated by the fact that police interrogated Mya's wife about the photograph. In a subsequent phone conversation, Mya's wife advised him to stay in the United States as long as he could. Because his wife refused to speak openly for fear that the telephones might be tapped, Mya understood her to warn him that returning to Burma was unsafe. Mya's wife continues to live in Rangoon with their other son and his family, and has not been arrested or subjected to any further questioning by the police.

As part of his asylum application, Mya also submitted evidence about Burma's mistreatment of other parents of student activists. He included an affidavit from a Rangoon University student organizer named Ba Kyaw, who asserted that he had been arrested in 1989 and imprisoned for four months before fleeing to the jungle on the Thai border. According to Kyaw, his father was arrested by SLORC and then sentenced to twelve years' imprisonment for attempting to contact him in 1990 by letter. Mya and Thant also testified at the hearing about other parents who had been arrested and imprisoned for not reporting communications with their activist children.

## III. Analysis

 This court reviews decisions of the BIA deferentially. We must uphold the Board's conclusion "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105(a)(4); *Angoucheva v. INS*, 106 F.3d 781, 788 (7th Cir.1997). In a case such as this one, where the BIA summarily affirms an IJ's decision, we base our review on only the IJ's analysis. See *Guentchev v. INS*, 77 F.3d 1036, 1038 (7th Cir.1996). However, the BIA's summary affirmance of a flawed decision by an IJ may lead us to

---

1. In November 1997, Burma's military leaders announced a reshuffling of their ruling council, which included a change of name from the SLORC to the "State Peace and Development Council." Burmese Laureate Reserves Judgment on Changes, N.Y. Times, Nov. 25, 1997, at A10.

conclude that the BIA's decision is insufficient. See *Draganova v. INS*, 82 F.3d 716, 720 (7th Cir.1996).

■ In order to qualify for asylum, Mya must establish that he is unwilling to return to Burma "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). To show a well-founded fear, he must demonstrate both that the fear is genuine and that it is reasonable in light of the credible evidence. See *Dobrican v. INS*, 77 F.3d 164, 167 (7th Cir.1996).

## A. Past Persecution

■ As an initial matter, we uphold the IJ's conclusion that Mya has failed to establish past persecution. Substantial evidence supports the IJ's finding that the events described by Mya—namely, being interrogated twice about the whereabouts of his son, having his home searched on three separate occasions, and being forced to sign an agreement to report his son's location if his son contacted him-"did not describe any conduct by the Burma military and/or police forces that would tend to indicate any unreasonableness." The incidents described by Mya are not sufficiently serious to rise to the level of persecution. See *Borca v. INS*, 77 F.3d 210, 215 (7th Cir.1996) (being interrogated twice, having dwelling searched twice, and receiving threatening phone calls did not rise beyond level of harassment).

## B. Well-founded Fear of Persecution

We turn next to Mya's claim that he has a well-founded fear of persecution based upon either imputed political opinion or membership in a "particular social group," a group

which he identifies as comprised of parents of Burmese student dissidents.

### 1. Imputed political opinion.

■ One way that an applicant can establish a "political opinion" under the INA is to show an imputed political opinion. An imputed political opinion is a political opinion attributed to the applicant by his persecutor. *Meza–Manay v. INS*, 139 F.3d 759, 763–64 (9th Cir.1998); *Cruz–Diaz v. INS*, 86 F.3d 330, 332 (4th Cir.1996); *Ravindran v. INS*, 976 F.2d 754, 760 (1st Cir.1992); *Perlera–Escobar v. Executive Office for Immigration*, 894 F.2d 1292, 1298 (11th Cir.1990). Mya claims that the government has singled him out for persecution because it mistakenly believes that he shares the same political opinions as his son.

The IJ found, correctly, that Mya's fears were "speculative in nature" and "not objective." [2] Mya has not substantiated his claims that the Burmese government has imputed his son's political views to him. He has not pointed to any situation in which the government has held him accountable for Thant's political activities, let alone persecuted him for any imputed political opinions. Cf. *Meza–Manay*, 139 F.3d 759, 763–65 (death threats and attempts on applicant's life established that Peruvian terrorist group Shining Path imputed to her the political opinions of her husband, a police counter-insurgency specialist responsible for capturing Shining Path leaders). To the contrary, as Mya himself testified, the police interrogations focused solely on Thant's whereabouts, and not on Mya's views of Thant's political opinions.

Furthermore, Mya did not suffer any physical harm during these interrogations. Unlike the applicant in *Ramirez Rivas v. INS*, 899 F.2d 864, 865–66 (9th Cir.1990), whose father was shot and friend killed for imputed political opinions based on family

---

**2.** Less understandable is the IJ's finding that Mya's "fear of returning to Burma, while [it] may be genuine, appear[s] more attributable to the uncertainty and [] sweeping and massive changes that are currently happening in Burma." This statement is perplexing and unfounded. First, the IJ never identifies what "sweeping and massive changes" are "currently happening." More significantly, the IJ's finding runs counter

to State Department annual country reports emphasizing that Burma—as has been the case for more than 30 years—continues to be ruled by a highly repressive military regime condemned for its serious human rights abuses. Since we are remanding this case, the Board may wish to clarify the IJ's "sweeping and massive" language.

relationships, no member of the Lwin family has been harmed on account of Thant's participation in anti-government activities. Furthermore, Mya's family-owned business continues to operate profitably, his wife still resides in their same home, and their two other grown children continue to live in Burma without incident. See *Rodriguez–Rivera v. U.S. Dep't of INS*, 848 F.2d 998, 1006 (9th Cir.1988) (per curiam) (fact that applicant continued to live undisturbed in same place undermined his claim to have a well-founded fear of persecution). Mya cannot support his argument that Burma's military leaders have imputed a hostile political opinion to him on account of his relationship to his son, and we affirm the BIA's decision on this claim.

### 2. Particular social group.

Mya also claims that he is entitled to asylum because he faces persecution as a member of a particular social group, namely the social group consisting of parents of Burmese student dissidents. Because the IJ did not discuss the claim in her decision, Mya argues that this case must be remanded for further consideration.

■ The government contends that the IJ did not address Mya's social group claim because Mya failed to raise it during his administrative proceedings. Our interpretation of the record is more charitable. We note that Mya, in his supplemental statement filed with the IJ, defined his particular social group as "parent[s] of a student democracy activist." Later, at his hearing, Mya responded to his attorney's questions and elaborated on his membership in such a group:

Q: To your knowledge, have any other parents of—of student activists been arrested or imprisoned?

A: Yes, I know.

\* \* \*

Q: Why—why do you think these other parents were arrested? The other parents of the political activists? Why do you think they were arrested or imprisoned?

A: They were caught red handed.

Q: What do you mean they were caught red handed?

A: They—they caught the letters. How they contact, you know? They got the letters and so they arrest the parents.

Q: Which letters?

A: All the parents and the children write, those letters are confiscated and they arrest the parents.

\* \* \*

Q: Do you have any—so do you think this would happen to you were you to return to Burma? Do you think you would be arrested or imprisoned?

A: Yes.

At the close of the hearing, counsel again apprised the IJ of the nature of Mya's claim when he summarized Mya's position as fearing persecution based on "membership in a social group, that being parents of—of activists who have fled the country and subsequently contacted with their children and who then are punished by the military government of Burma."

Mya also sufficiently raised his social group claim in his brief before the BIA. Reiterating that he faces persecution "due to his membership in a particular social group (parents of student activists)," he argued that the IJ "ignored Mya's evidence regarding other persons similarly situated being subjected to persecution for contacting their children." Mya added in his brief that the military has a "history of persecution of other Burmese parents who contacted their dissident children." We conclude that Mya preserved his social group claim throughout the administrative proceedings.

■ This court has outlined a three-part test for obtaining asylum based on social group membership. " '[A]n alien must: (1) identify a particular social group; (2) establish that [he] is a member of that group; and (3) establish that [his] well-founded fear of persecution is based on [his] membership in that group.' " *Iliev v. INS*, 127 F.3d 638, 642 n. 3 (7th Cir.1997) (quoting *Sharif v. INS*, 87 F.3d 932, 936 (7th Cir.1996)).

Although social group membership has increasingly been invoked as the basis of asylum claims, the meaning of "social group" remains elusive. The legislative history be-

hind the term (which traces back to the Refugee Act of 1980) is uninformative, and judicial and agency interpretations are vague and sometimes divergent. As a result, courts have applied the term reluctantly and inconsistently. See T. David Parish, Note, Membership in a Particular Social Group under the Refugee Act of 1980: Social Identity and the Legal Concept of the Refugee, 92 Colum. L.Rev. 923, 939–44 (1992). This court has yet to set forth any criteria for determining social group status, though we have indirectly treated the family relationship as a basis for identifying a "particular social group." See *Iliev*, 127 F.3d at 642 n. 4 (collecting cases); cf. *Sharif v. INS*, 87 F.3d 932, 936 (7th Cir.1996) (noting that while family relationship could comprise a social group, the cognizability of a group of Iranian women who had become "westernized" while living in the United States was "debatable at best"); *Bastanipour v. INS*, 980 F.2d 1129, 1132 (7th Cir.1992) (observing that "we have no doubt that drug traffickers are not the sort of 'particular social group' to which the provision on asylum refers").

■ The BIA, whose interpretation of Refugee Act provisions is entitled to deference, see *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), has delineated only an outer limit of a definition. *In Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), the Board required that members of a "particular social group" share a "common, immutable characteristic" such as sex, race, kinship, or in some cases, past experiences such as former military service or land ownership. *Id.* (rejecting claimed social group of Salvadoran taxi cooperative because characteristics that defined taxi drivers were not immutable; the drivers could change jobs). Despite the broad range of social groups that has been proposed to it, the Board has never concretely defined what makes a social group cognizable.[3]

The courts similarly have struggled to provide workable criteria for determining social group status. The First and Third Circuits have endorsed Acosta's "immutable characteristics" definition as central to the determination of what constitutes a particular social group. See *Fatin v. INS*, 12 F.3d 1233, 1239–41 (3d Cir.1993) (observing that Iranian petitioner who refused to conform to Iranian government's gender-specific laws may well satisfy Acosta definition "simply because she [was] a woman"); *Ananeh–Firempong v. INS*, 766 F.2d 621, 626 (1st Cir.1985) (noting that individuals associated with former government of Ghana could comprise social group because their fears of persecution arose from characteristics beyond their power to change); see also *Meguenine v. INS*, 139 F.3d 25, 28 n. 2 (1st Cir.1998) (approving social group definition that requires "some immutable trait (such as an ethnic group) or a mutable trait which a member of that group should not, in good conscience, be required to change (such as a religious adherent's beliefs)"); *Alvarez–Flores v. INS*, 909 F.2d 1, 7 (1st Cir.1990) (applying the Acosta standard but declining to resolve whether former campesino cheesemakers in El Salvador are social group).

But the Ninth Circuit has charted a different course, construing "social group" to represent a "voluntary associational relationship" among its members. *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir.1986). In Sanchez–Trujillo, the court, without acknowledging Acosta, held that a social group "implies a collection of people closely affiliated with each other, who are actuated by some common impulse or interest." Id. (rejecting claimed social group of "young, working class males who have not served in the military of El Salvador"). See *Li v. INS*, 92 F.3d 985, 987 (9th Cir.1996) (rejecting claimed social group of Chinese citizens "whose only common characteristic is their low economic status"); *De Valle v. INS*, 901

3. Groups that the BIA has recognized as "particular social groups" subject to persecution include Filipinos of Chinese ancestry, In re V–T–S, Int. Dec. 3308 (BIA 1997); young women of the TchambaKunsuntu ethnic tribe who have not undergone forced genital mutilation and who oppose the practice, Matter of Kasinga, Int. Dec.

3278 (BIA 1996) (en banc); the Marehan subclan of the Darood clan in Somalia, Matter of H—, Int. Dec. 3276 (BIA 1996); gay men and lesbians in Cuba, Matter of TobosoAlfonso, Int. Dec. 3222 (BIA 1990); and former members of the national police of El Salvador, Matter of Fuentes, 19 I. & N. Dec. 658, 662 (BIA 1988).

F.2d 787, 792–93 (9th Cir.1990) (rejecting claimed social group of "family members of deserters" from El Salvadoran army on basis of Sanchez–Trujillo; "[f]amily members of deserters, like young urban males, are also a diverse, fragmented segment of the population"); see also *Safaie v. INS,* 25 F.3d 636, 640 (8th Cir.1994) (rejecting as overbroad purported group of Iranian women whose claims were based solely on gender and the harsh restrictions placed upon them as women).

Finally, the Second Circuit has proposed its own variation, emphasizing that external perceptions of a group are as important as immutability and voluntary association in defining a particular social group. *Gomez v. INS,* 947 F.2d 660, 664 (2d Cir.1991) (holding that women previously beaten and raped by Salvadoran guerrillas did not comprise a social group because they lacked a "recognizable and discrete" attribute that would enable their persecutors to distinguish them from other young women). Under this variation, a particular social group consists of individuals who possess some fundamental characteristic in common that distinguishes them in the eyes of either the persecutor or the outside world. *Id.*

 Having considered the various approaches selected by other circuits, we believe that the best approach is to accept the formulation proposed by the BIA in Acosta, and adopted by the First and Third Circuits. Thus the common characteristic that defines the group "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Acosta,* 19 I. & N. Dec. at 233. This preserves the concept that refugee status is restricted to "individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution." *Id.* The Ninth Circuit's requirement of a "voluntary associational relationship," read literally, conflicts with Acosta's immutability requirement. Moreover, the Second Circuit's proposal, while useful in pointing out the significance of external perceptions of a group, offers little guidance in the way of a positive definition of the term "social group."

 When the Acosta formulation is applied to the facts of this case, we conclude that parents of Burmese student dissidents do share a "common, immutable characteristic" sufficient to comprise a particular social group. But that element is only the first of three that Mya must establish. See *Iliev,* 127 F.3d at 642 n. 3. Mya must also satisfy the critical third element: he must show that he has a well-founded fear of persecution for being the parent of a student dissident. For this fact-based inquiry, we must remand. Although Mya pressed his social group claim repeatedly before the IJ and the Board, his arguments were disregarded at each step of the administrative proceedings. "Agencies must respond to the arguments made to them." *Hengan v. INS,* 79 F.3d 60, 64 (7th Cir.1996). See also *Angoucheva v. INS,* 106 F.3d 781 (7th Cir.1997); *Salameda v. INS, 70 F.3d 447, 451 (7th* Cir.1995); *Sanon v. INS,* 52 F.3d 648, 652–53 (7th Cir.1995); *Shahandeh–Pey v. INS,* 831 F.2d 1384, 1389 (7th Cir.1987). Because the record does not reflect that either the IJ or the Board considered the specific circumstances of Mya's social group claim, we cannot say that the BIA's denial of asylum was based on substantial evidence. We therefore vacate the Board's decision and remand this case for a more careful examination of the extent to which parents of Burmese student dissidents could be exposed to persecution.

## IV. Conclusion

We AFFIRM the IJ's conclusions that Mya Lwin has failed to establish past persecution and a well-founded fear of persecution based on political opinion. The record, however, does not reflect that the IJ or the BIA inquired into Mya's social group claim; accordingly, we VACATE the BIA's decision and REMAND the case for a more careful examination on the degree to which a group comprised of parents of Burmese student activists could be subject to persecution. Because the BIA's asylum determination must be set aside, the question of Mya's eligibility for withholding of deportation must also be remanded.

PETITION FOR REVIEW GRANTED.

The BIA's order is AFFIRMED IN PART and VACATED IN PART. The case is REMANDED to the BIA for further proceedings.