**Juan VALENSUELA–ORTEGA,**
**Plaintiff–Appellant,**

v.

**IMMIGRATION AND NATURAL-**
**IZATION SERVICE, Defen-**
**dant–Appellee.**

**No. 01–3461.**

United States Court of Appeals,
Sixth Circuit.

Feb. 12, 2003.

Before GUY, SILER and
BATCHELDER, Circuit Judges.

SILER, Circuit Judge.

Juan Valensuela–Ortega ("Valensuela"),
a citizen of Guatemala, petitions for review
of a Board of Immigration Appeals (BIA)
order affirming the decision of the Immi-
gration Judge (IJ) denying his petition for
asylum and ordering his deportation. We
affirm.[1]

I.

Valensuela illegally entered the United
States in February 1993. In 1987, he be-
came a Guatemalan police officer. Later,
he investigated homicides. He assisted in
the investigation of the murder of Myrna
Mack, who was researching the govern-
ment's policies toward displaced peasants.
From the beginning of the investigation,
there was physical evidence to suggest
that the Guatemalan military intelligence
unit known as the "G–2" may have played
some role Mack's death. After a very
brief involvement by Valensuela, his super-

---

1. As the IJ's decision of March 21, 1996,
occurred before the effective date of the Ille-
gal Immigration Reform and Immigrant Re-
sponsibility Act of 1996, we retain jurisdiction
to hear the appeal from the BIA in this mat-
ter. *Kalaw v. INS*, 133 F.3d 1147, 1149–50
(9th Cir.1997).

visor, Estuardo Mendez–Vasquez, relieved Valensuela from any further participation in the Mack investigation. Shortly thereafter, Emilio Escobar was placed in charge of the investigation. In late 1991 or early 1992, Mendez and Valensuela were transferred to the police academy. Valensuela served as Mendez's bodyguard, but he considered the new assignment a demotion.

In June 1991, Escobar testified before a court in Guatemala concerning the involvement of the Guatemalan security forces. In August, before he could testify before the Inter–American Commission on Human Rights, Escobar was killed. Another investigator that assisted with the Mack investigation, Julio Cesar Perez Ixcajop, left the country after the murder of Escobar. In February 1993, Mack's killer was convicted of murder. Valensuela did not testify or otherwise participate in the trial. Human rights activists were dissatisfied with the investigation. They alleged that the G–2 involvement was not investigated and that a cover-up had taken place.

Valensuela admits that between the Mack murder in 1990 and his departure from Guatemala in 1993, he was not threatened, arrested or harmed. In 1991 or 1992, the windshield of his car was broken, an event that he admits is common in Guatemala. Valensuela contends, however, that after the transfer to the police academy, Mendez advised him to leave Guatemala. At his own request, Valensuela left the police department in January 1993, sold the family residence, obtained passports for the family, and all left for the United States without incident.

Mrs. Valensuela testified that at the beginning of 1992, she received two phone calls at times when Mr. Valensuela was not at home, both of which came from the same unidentified man. He warned Ms. Valensuela to tell her husband to be careful, to take care of himself and to "guard his life ... [or else] it will be taken from him." Mrs. Valensuela received two additional calls in November or December 1992, during which the same caller said "take care of yourself" and then hung up. Mrs. Valensuela also related two occasions in which she was riding the bus home from her job when a man got on the bus and started staring at her. On both occasions, the man got off the bus when policemen boarded the bus. After the second incident, Mr. Valensuela began driving his wife to and from work.

The IJ held a hearing on Valensuela's request for asylum and found Valensuela and his wife to be credible witnesses, although he suspected that they "exaggerated to some extent" their level of fear in Guatemala. The IJ found it significant that despite the alleged danger Valensuela faced due to his limited involvement in the Mack investigation, he did not have any problems until over a year later. Also, the IJ took notice that Valensuela did not leave the country until almost a year and a half after Escobar was killed and Ixcajop departed from Guatemala. Accordingly, the IJ held that Valensuela did not experience anything that rose to the level of persecution. In the IJ's view, Valensuela's allegations, at best, amounted to two "very ambiguous circumstances": a broken windshield and perhaps a demotion to the police academy. Likewise, the calls received by Mrs. Valensuela and incidents on the bus were not found to be linked to the Mack investigation.

In addition, the IJ concluded that Valensuela's fears of future persecution in Guatemala were not objectively reasonable. The IJ found that even if Valensuela had been in some danger in the immediate aftermath of the Mack slaying in 1990 and 1991, with the passage of time and events, "he is probably in virtually no danger whatsoever today." Even if there was a

danger, the IJ held that there was no nexus between the harm and any of the grounds protected by the Immigration and Nationality Act (INA). Valensuela admitted in his testimony that he was not political and never expressed any concerns or public comments concerning the Mack investigation. Also, "conscientious and dedicated members of the national police" do not constitute a particular social group under the INA. So, even presuming past difficulties, there was no evidence of any threat of future persecution.

Finally, the IJ held that even if everything alleged by Valensuela was taken to be true, the conditions in Guatemala "had changed sufficiently, as to immoderate current concerns in the future." The IJ noted that following the change in presidency since Valensuela left, communications between the government and human rights activists had opened; in fact, the president was the former human rights ombudsman. In light of his findings, the IJ concluded that Valensuela had failed to meet his burdens to establish his eligibility for asylum and withholding of deportation.

Valensuela appealed to the BIA. The BIA conducted a *de novo* review and affirmed. In its decision, the BIA noted that Valensuela was never harmed or had any threatening encounters, offered no evidence that the government had imputed any political opinion to him, or any evidence linking the phone calls, bus incidents, or broken car window to his limited investigation of the Mack murder. Further, the BIA observed that in the eight intervening years there was no evidence that the government had any interest in Valensuela. Accordingly, it found that Valensuela failed to establish his eligibility for asylum, much less the "clear probability" standard for withholding of deportation and dismissed his appeal.

STANDARD OF REVIEW

In reviewing the factual determinations of the BIA regarding an alien's eligibility for asylum and withholding of deportation, this court must apply the substantial evidence standard of review. *Klawitter v. INS.*, 970 F.2d 149, 151 (6th Cir.1992). In order to reverse the BIA's factual determinations, we must find that the evidence not only supports a contrary conclusion, but indeed compels it. *INS v. Elias–Zacarias,* 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The BIA's determination that an alien is not eligible for asylum must be upheld unless the alien shows that the evidence he or she presented was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Id.* at 484, 112 S.Ct. 812.

Valensuela argues that where the BIA summarily affirms the IJ's decision, this court should base its review only on the IJ's analysis. Citing *Lwin v. INS,* 144 F.3d 505, 508–09 (7th Cir.1998), Valensuela contends that the BIA's summary affirmance of a flawed decision by an IJ may lead us to conclude that the BIA's decision was "insufficient." However, the BIA did not summarily affirm the IJ. Although its opinion may be short, the Board discussed the relevant facts and law and agreed with the IJ in what it viewed as a relatively straightforward decision.

DISCUSSION

Section 208(b)(1) of the INA, 8 U.S.C. § 1158(b)(1), authorizes the Attorney General, in his discretion, to grant asylum to an alien who is a "refugee." Under the Act, a "refugee" is an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

In order to demonstrate eligibility for asylum on the basis of a well-founded fear of persecution, under 8 C.F.R. 208.13(b)(2), an applicant must establish that: (1) he has a fear of persecution in his country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) he is unable or unwilling to return to that country because of such fear.

Valensuela's claim fails on numerous grounds as discussed in the IJ's decision. The BIA agreed that there was insufficient evidence of past persecution, much less on account of race, religion, nationality, membership in a particular social group, or political opinion, and no evidence of any rational basis for a fear of future prosecution. Objectively, the factual allegations of Valensuela do not demonstrate a fear of persecution. " '[P]ersecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir.1998) (removal of emphasis). Valensuela's claims of vague threats do not even approach this standard. At best, his allegations demonstrate that he and his wife were the object of some threatening phone calls by one person and weird looks on the bus, as well as a broken window. Crediting every statement made by Valensuela and his wife, there is no evidence of any linkage between those incidents and the Mack investigation. On the contrary. the alleged threats were removed in time from the investigation and all involvement by Valensuela. Furthermore, there is no basis to have imputed any political position to Valensuela regarding the murder. Valensuela admittedly did not testify or talk to anybody about the investigation and hence there is no basis for him to be persecuted. In short, all of the alleged threats and linkage to the Mack investigation are speculation, and, as the IJ found, "exaggerated" by the Valensuelas.

Additionally, conscientious police officers are not a social group within the meaning of the INS regulation. There is no credible evidence that this group exists or that Valensuela was part of such generic group if it did exist. Furthermore, the political imputation of any position to Valensuela by the government regarding the Mack investigation is without any basis in the record.

Therefore, there was substantial evidence to support the BIA's finding that neither the requisite objective fear of persecution nor membership in a statutorily defined class existed in this case. Accordingly, the BIA did not err in denying Valensuela's application for asylum and, consequently, his request to withhold deportation.[2]

AFFIRMED.

---

**2.** As the BIA noted in its decision, having failed to carry the burden for establishing eligibility for asylum, Valensuela necessarily failed to satisfy the more stringent standard for withholding deportation: a clear probability that the alien would be subject to persecution in the country to which he would be returned. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 425, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("[T]he 'well-founded fear' standard which governs asylum proceedings is different, and in fact more generous, than the 'clear probability' standard which governs withholding of deportation proceedings.").