# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-2524

DJILLALI AHMED,

*Petitioner,*

v.

JOHN ASHCROFT, Attorney General
of the United States,

*Respondent.*

———————

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A77-820-051

———————

SUBMITTED APRIL 11, 2003—DECIDED OCTOBER 30, 2003

———————

Before EASTERBROOK, MANION, and DIANE P. WOOD,
*Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.*   From 1992 to 1996,
Djillali Ahmed served in the Algerian military and state po-
lice forces. He resigned his post in 1996 and spent the next
three years evading Islamic militants who, he believed,
posed a grave threat to his safety. In 1999, he slipped
into the United States as a stowaway. Shortly after his ar-
rival, Ahmed was placed in removal proceedings pursuant
to the Immigration and Nationality Act (INA), 8 U.S.C.
§ 1182(a)(6)(A)(i). He filed for political asylum, withholding

of removal, voluntary departure, and protection under the United Nations Convention Against Torture (Torture Convention), 8 C.F.R. § 208.16(c), because he feared that he would be killed by the same militants if he were compelled to return to his native Algeria. An Immigration Judge (IJ) denied relief, and the Board of Immigration Appeals (BIA) affirmed. Ahmed now petitions for review. Though we part ways with the BIA's analysis in some respects, we deny the petition for review.

# I

Since its people won independence from French colonial rule in 1962, Algeria has been governed by one party, the National Liberation Front (NLF), which has enjoyed the backing of the military. In the late 1980s, the regime made an attempt at democratization in response to popular opposition to military control. As part of that effort, it allowed parties to form and authorized a series of local and national elections. The Islamic Salvation Front (FIS), an umbrella Islamic party, swept the local elections held in 1990 and also an initial round of national parliamentary elections held in 1991. The FIS was poised to repeat its success in the next round of national elections—and would likely have commanded an absolute parliamentary majority—when a military coup in January 1992 brought the entire process to an abrupt halt. The restored NLF regime voided the elections, banned the FIS, and launched a campaign of imprisonment, torture, and execution of FIS officials and their supporters.

What followed has been a *de facto* civil war that has pitted the government against a variety of armed Islamic groups—including remnants of the FIS and an Algerian branch of the Groupe Islamique Armé (GIA)—that seek to overthrow the government and establish an Islamic state. The fighting has ranged from pitched, open warfare to the

perpetration of horrific acts of terrorism against government officials and private citizens alike, invariably followed by violent retaliation by the government. The human rights report issued by the U.S. Department of State in 1999 cites estimates by non-governmental observers that as many as 77,000 civilians, Islamic militants, and security force personnel died between 1992 and 1999 alone in armed clashes, torture, terrorism, and extrajudicial killings.

As a member of the national security forces, and then later as an officer with the state police force, Ahmed lived through this horror. In his written application for asylum and during the subsequent hearing before the IJ, Ahmed stated that he served in the Algerian military from 1992 to 1994. While a member of the military, he spent ten months guarding a detention camp for captured Islamic terrorists. In 1994, Ahmed left the military and joined the Algerian state police force, where he served as a security guard at the Sess Enia International Airport. He resigned this position two years later, in 1996, after several of his colleagues were killed by armed Islamic militants while being transported by bus from the airport where they served as security guards to the government compound where they lived. He then moved to the desert and lived on a farm for two years, apparently without incident. No longer content with what he described as living in hiding, Ahmed fled Algeria and entered the United States illegally in February 1999 as a stowaway aboard a ship.

Shortly after his arrival in the United States, Ahmed was placed in removal proceedings. He conceded removability, but he also petitioned for political asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3), withholding of removal under Article III of the Torture Convention, and voluntary departure under 8 U.S.C. § 1229c(a)(1) and (b)(1). At a hearing held on January 3, 2000, the IJ found Ahmed's testimony about his

experiences in Algeria to be fully credible. The IJ similarly credited Ahmed's claim that his two brothers continue to be employed as officers in the Algerian state police force. Nevertheless, the IJ concluded that Ahmed was statutorily ineligible for relief. Ahmed petitioned the BIA for review of all but the voluntary departure claim. The BIA affirmed the IJ's decision on May 21, 2002, finding that Ahmed could not show past persecution from his former status as a military and police officer, because he had not pointed to anything that was separable from the occupational hazards that went along with those jobs, nor could he show a well-founded fear of future persecution, because he had not adequately developed the latter claim. The BIA also rejected his other grounds for relief, and this appeal followed.

## II

In this appeal, Ahmed focuses on the BIA's denial of his petition for political asylum and withholding of removal under the INA and protection under the Torture Convention. Our review throughout is governed by the substantial evidence standard. *Begzatowski v. INS*, 278 F.3d 665, 668 (7th Cir. 2002). Applying that standard, we assess whether the BIA's determination was "supported by reasonable, substantial, and probative evidence on the record considered as a whole," and reverse only if the evidence compels a contrary conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Krouchevski v. Ashcroft*, 2003 WL 22097844 at *3 (7th Cir. 2003). We review the BIA's legal conclusions *de novo. Ciorba v. Ashcroft*, 323 F.3d 539, 544 (7th Cir. 2003).

Because an applicant who fails to establish eligibility for asylum necessarily cannot satisfy the more stringent requirements for withholding of removal under 8 U.S.C. § 1231(b)(3), see *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002), nor the requirements for withholding of remov-

al under the Torture Convention, see *Dandan v. Ashcroft*, 339 F.3d 567, 575 n.7 (7th Cir. 2003), we turn first to Ahmed's asylum claim. To obtain asylum under the INA, an applicant must prove, see **8 C.F.R. § 208.13(a)**, that: (1) she is outside her country of nationality; (2) she is "unable or unwilling to return to . . . that country"; (3) this inability or unwillingness is due to "[past] persecution or a well-founded fear of [future] persecution"; and (4) such persecution is "on account of race, religion, nationality, membership in a particular social group, or political opinion." **8 U.S.C.**

**§ 1101(a)(42).**

We consider first whether the BIA's conclusion that Ahmed had not demonstrated past persecution is supported by substantial evidence. Ahmed's time spent moving from place to place in the desert was by his own admission uneventful. And while we have noted in the past that avoiding harm by "living a fugitive's life" is not necessarily inconsistent with a finding of persecution, see *Chitay-Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir. 1999), the facts in this case do not compel a finding that this is what Ahmed was doing. The Board was not required to defer to his personal judgment that he was better off living in hiding, as it evaluated his claim of past persecution. Moreover, it was entitled to take into account Ahmed's failure to present any detailed facts suggesting that he himself suffered from concrete acts of persecution, or that his move to a remote desert farm was necessary to evade such acts. Ahmed's testimony before the IJ focused largely on threats to his brother and the bus ambush that resulted in harm to several of his fellow security officers. None of these events involved harm or the threat of harm to Ahmed himself. In any event, unfulfilled threats are generally insufficient to establish past persecution. See *Boykov v. INS*, 109 F.3d 413, 416-17 (7th Cir. 1997); see also *Mitev v. INS*, 67 F.3d 1325, 1330-31 (7th Cir. 1995) (noting that only threats of a most immediate and menacing nature may constitute past persecution).

The BIA also had adequate grounds for finding that fearing for one's life while employed as a police officer will not normally amount to persecution within the meaning of the statute. This is a sensible position, given the fact that the job of security and police officers includes quelling public disorder and will, as a matter of course, bring such officers into contact with criminal and even violent elements of a society. Confronting dangerous situations as an officer charged with keeping the peace is simply not the same as persecution. The fact that courts have defined persecution to include "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate," *Toptchev*, 295 F.3d at 720 (internal quotation marks omitted), does not compel a different result. In short, substantial evidence supported the BIA's finding that the dangers Ahmed experienced while serving as a military and police officer arose from the nature of his employment and did not amount to past persecution for purposes of an asylum claim.

This is not to say, however, that there is an irrebuttable presumption that police officers or military personnel can never show past persecution based on that status. The BIA might have left that impression, when it wrote that:

> dangers faced by police[ ] [officers] as a result of that status alone are not ones faced on account of race, religion, nationality, membership in a particular social group, or political opinion. Such dangers are perils arising from the nature of their employment and domestic unrest rather than "on account" of immutable characteristics or beliefs.

As authority for this language, the BIA cited its earlier decision in *Matter of Fuentes*, 19 I. & N. Dec. 658 (BIA 1988). There, the BIA carefully distinguished between dangers encountered by current police officers and those encoun-

tered by former police officers. Status as a current police officer, the BIA concluded, is a mutable characteristic and, moreover, necessarily involves dangers of a sort not typically faced by the general population, since police forces are "highly visible embodiments of the power of the state." *Id.* at 661. By contrast, status as a former police officer, the BIA noted, is an immutable characteristic that can, under certain circumstances, subject an individual to a particularized threat of harm. *Id.* at 662.

To the extent the BIA was suggesting that there is a *per se* rule against finding past persecution for dangers encountered during service as a police officer, we think that it may have gone too far (though we need not come to a definitive ruling on this point in the present case). We have never adopted the distinction between current and former police officers set forth in *Fuentes*. Indeed, Ahmed's own case might have been different if he had tendered evidence, say, that he was captured and tortured as a result of his employment as a police officer, perhaps because his captors wished to extract information about the inner workings of the police force, or to discourage enlistment and choke off the government's supply of new police recruits. In such a case, if the government was responsible somehow for the actions of the persecutors, it would be arguable that the officer had a protected characteristic recognized by the statute. *Cf. Elias-Zacarias*, 502 U.S. at 482.

Furthermore, immutability, while important, has never been the last or only word on the definition of a social group. Many social groups are labile in nature, and we have struggled to define what makes a "social group" cognizable under the statute. For instance, in *Lwin v. INS*, 144 F.3d 505 (7th Cir. 1998), we began with the "immutable characteristics" definition set forth in *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), and then went on to use a definition that included groups of individuals who shared

particular characteristics and "who [were] either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution." *Lwin*, 144 F.3d at 512 (quoting *Matter of Acosta*, 19 I. & N. Dec. at 233). Applying that definition, we recognized "parents of student dissidents" as a social group, even though that status is no more or less changeable—the children in question could die or cease being dissidents—than status as a police or military officer. Under the *Lwin* test, an applicant in Ahmed's position would merely have to prove that her decision to seek employment with the security or police forces was motivated by beliefs that she should not be required to change as a matter of conscience. *Id.* at 512. These might include a belief in law and order, in democratic government, or in service and duty to country. These possibilities are enough to persuade us to leave definitive resolution of the status of present police officers for another day.

Ahmed also tried to justify the relief he was requesting based on a well-founded fear of future persecution. He presented two separate bases for this argument: first, his past service as a security and police officer, and second, his two brothers' current status as police officers. The BIA relied on *Fuentes* and *Lwin* in its ruling. It acknowledged that status as a *former* member of the military or police forces is an immutable characteristic that, with the right factual showings, can satisfy this criterion for asylum. Nonetheless, the BIA found that Ahmed had failed to submit specific evidence showing that he was more vulnerable to attack than members of the general public, and thus that his claim based on future persecution should also be rejected.

Ahmed has attempted to counter this finding with some observations that do not meet the substance of the Board's concern. For example, he appears to believe that the BIA thought that the dangers experienced by former police officers were some sort of occupational hazard, just like those

it discussed for current police officers. But the BIA's opinion reflects no such finding in the section devoted to the future persecution claim. Ahmed also contends that the BIA erred by failing to acknowledge that Muslim extremists were likely to impute to him support for the Algerian government because of his status as a former police officer. It is true that an applicant can show that a persecutor is likely to impute or attribute a "political opinion" to him. See *id.* at 509; see also *Meza-Manay v. INS*, 139 F.3d 759, 763-64 (9th Cir. 1998); *Cruz-Diaz v. INS*, 86 F.3d 330, 332 (4th Cir. 1996); *Ravindran v. INS*, 976 F.2d 754, 760 (1st Cir. 1992). But here again, a careful reading of the BIA's opinion shows that its rejection of Ahmed's claim was not based on the view that political opinions cannot be attributed in this way. Instead, the BIA's decision is more properly read as finding insufficient both the quantum and the specificity of the evidence adduced by Ahmed.

The question before us is therefore whether substantial evidence supported the BIA's decision with respect to future persecution. To be entitled to relief, Ahmed's fear of future persecution must be subjectively genuine and must also have an objective basis. See *Bhatt v. Reno*, 172 F.3d 978, 981 (7th Cir. 1999). Only the objective part of that test is at issue here, because the IJ credited Ahmed's testimony about his subjective fear of death upon his return to Algeria. As to the objective portion of the test, an asylum applicant must "present *specific, detailed* facts showing a good reason to fear that he or she will be singled out for persecution." *Sayaxing v. INS*, 179 F.3d 515, 520 (7th Cir. 1999) (emphasis in original) (quoting *Sivaainkaran v. INS*, 972 F.2d 161, 163 (7th Cir. 1992), and *Zulbeari v. INS*, 963 F.2d 999, 1000 (7th Cir. 1992)); see also *Bhatt*, 172 F.3d at 982; *Krastev v. INS*, 101 F.3d 1213, 1216 (7th Cir. 1996); *Bevc v. INS*, 47 F.3d 907, 910 (7th Cir. 1995). An applicant need not establish that she will definitely be persecuted if she returns or even show that persecution is likely. Rath-

er, she must demonstrate that persecution is a "reasonable possibility." See *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987); *Sayaxing*, 179 F.3d at 520.

Nothing in the record of this case compelled the BIA to find that Ahmed met this demanding standard. Ahmed relies almost exclusively on his own uncorroborated testimony to establish a well-founded fear of persecution. This in itself is not necessarily fatal to his petition, but it places a premium on the content of that testimony. The implementing regulations and relevant decisions establish that the testimony of an applicant, if credible, can suffice to sustain the burden of proof without corroboration. 8 C.F.R. § 208.13(a); see also *Pop v. INS*, 270 F.3d 527, 530 (7th Cir. 2001). But see *Krastev*, 101 F.3d at 1218. In addition, as we have already noted, the IJ specifically found Ahmed's testimony to be credible in this case. This distinguishes Ahmed's case from a raft of cases in which we affirmed the BIA based on contradictory or other obviously unreliable testimony by an applicant. See, *e.g.*, *Mansour v. INS*, 230 F.3d 902, 906 (7th Cir. 2000); *Malek v. INS*, 198 F.3d 1016, 1021 (7th Cir. 2000); *Demirovski v. INS*, 39 F.3d 177, 181 (7th Cir. 1994); *Khano v. INS*, 999 F.2d 1203, 1208 (7th Cir. 1993).

Ahmed's testimony, however, was almost entirely devoid of dates or other specific details. See *Bhatt*, 172 F.3d at 982; *Demirovski*, 39 F.3d at 181; *Ademi v. INS*, 31 F.3d 517, 519 (7th Cir. 1994). In that respect, his case is very much like that of the petitioner in *Bhatt.* Bhatt, a citizen of India, sought asylum because of an alleged fear of persecution by Hindu radicals in retaliation for his aid to Muslims during riots in a Muslim neighborhood of Bombay in December 1992. We found that Bhatt's testimony about threats and harm was too vague, speculative, and insubstantial to establish either past or future persecution. In particular, we noted that Bhatt acknowledged that he had never been

tortured, arrested, or detained by Hindu militants or the police. We also observed that there was no corroborating evidence beyond his own allegations and testimony that he had been beaten during widescale rioting. See *Bhatt*, 172 F.3d at 982.

Like Bhatt, Ahmed has offered few specific facts to show that an objective threat existed. Ahmed argued that his prior employment and his brothers' current employment were "well known to many people" and have resulted in "numerous death threats." One of these threats involved a visit to his brother's home by the GIA in 1992, in the immediate aftermath of the canceled elections. In another incident, extremist "elements" tailed Ahmed's brother in the town bazaar. Another incident required his brother to flee from a checkpoint manned by extremist groups. Beyond these rather sketchy details, however, Ahmed stated only that his brother has received death threats "many, many times." Importantly, Ahmed's testimony does not describe a single incident suggesting that he himself was targeted.

The only possible source of evidence in the record, the State Department's Algeria Country Report on Human Rights Practices for 1998, contains little that supports the contention that Islamic militants are more likely to target Algerian security and police forces than other social groups. To the contrary, the report notes that "[a]rmed groups targeted both security force members and civilians" and that armed Muslims "continued their widespread campaign of insurgency, targeting government officials and families of security members, as well as persons whose lifestyles they consider to be in conflict with Islamic values." Later, the report notes that armed Muslims "particularly targeted women." Rather than establishing that Ahmed is likely to be singled out for persecution upon his return to Algeria, these reports suggest, sadly, that few segments of Algerian society have been spared from the depressing cycle of vio-

lence. Thus, with only Ahmed's uncorroborated testimony before it, the BIA was entitled to conclude that there was no objective threat to Ahmed in particular. See *Mojsilovic v. INS*, 156 F.3d 743, 747-48 (7th Cir. 1998); *Gramatikov v. INS*, 128 F.3d 619, 620 (7th Cir. 1997).

As the BIA recognized, an asylum claim based on status in a particular social group must be examined to determine whether the applicant has shown, among other things, that his fear of future persecution is objectively reasonable. Such a claim must also be examined to determine whether the danger flows from an ongoing violent struggle affecting the population in a relatively undifferentiated way or if danger exists on account of a protected ground; only the latter will suffice under the statute. Ahmed failed to offer objective support for his more speculative assertions. Moreover, the evidence did not compel the BIA to find that former members of the security and police forces in Algeria are targeted in a manner that is distinct from the risks borne by other segments of Algerian society.

As a final note, because Ahmed has not met the laxer burden of proof required to establish eligibility for political asylum under the INA, we decline to consider his claims for withholding of deportation under the INA and protection from removal under the Torture Convention, both of which involve a more stringent set of showings than a petition for asylum. See 8 C.F.R. § 208.16(c)(2); *Iliev v. INS*, 127 F.3d 638, 641 (7th Cir. 1997); *Cuevas v. INS*, 43 F.3d 1167, 1171 (7th Cir. 1995).

### III

Because the BIA's conclusions are supported by substantial evidence, the petition for review is DENIED.

No. 02-2524 13

A true Copy:

    Teste:

 

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*