UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**
*(Argued June 1, 2005)*

Decided September 1, 2005

**Before**

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 04-3348

ADRIAN CAUSHI,

|  |  |
|---|---|
| *Petitioner,* | On Petition for Review |
|  | of an Order of the |
| *v.* | Board of Immigration Appeals |
| ALBERTO R. GONZALES, | No. A 77 772 351 |
| Attorney General of the United States, |  |
| *Respondent.* |  |

**O R D E R**

Adrian Caushi, an ethnic Albanian citizen of Kosovo (an historically troubled region now under control of the United Nations, but still officially part of Serbia-Montenegro) petitions for review of an order of the Board of Immigration Appeals. Caushi had sought asylum, withholding of removal, and protection under the Convention Against Torture (CAT), on the ground that he would face persecution at the hands of both the Serbian government and the Kosovo Liberation Army (KLA) if he were to be sent back. The Immigration Judge denied each of these requests, and the BIA affirmed, finding that there has been a fundamental change in circumstances in

Kosovo since Caushi left in January 1999. Because we find that the BIA's decision was supported by substantial evidence, we deny the petition for review.

**I**

In May 1999, Caushi presented a fraudulent Slovenian passport in an effort to gain entry to the United States at Chicago's O'Hare International Airport. Recognizing the alleged passport for what it was, the former Immigration and Naturalization Service agents detained him. With the aid of an interpreter, Caushi admitted (speaking Albanian) that he actually was from Kosovo. He explained that in late 1998, he escaped the war that was then raging in Kosovo by crossing the border into Macedonia. There, he purchased a fake passport for 3,000 German marks (DM); four months later, he traveled to Milan, Italy, where he boarded an airplane for the United States.

At his asylum pre-screening interview in June 1999, Caushi testified that he had participated in a few political demonstrations in high school, had been "chased by the police two or three times," and on one occasion had been "hit and beaten" by the police with "sticks." Nonetheless, he acknowledged, he had never been arrested. To avoid the police, he continued, he stopped attending classes at school and stayed "locked" in his house or within the confines of his village for the next ten years. He left Kosovo then because he was "being chased by the authorities to be executed." When asked whether he feared returning to Kosovo, he replied that it might be dangerous for at least one year for him to return, in spite of the fact that NATO troops were stationed there, because "no one would protect him" and he assumed that his house had been burned down, leaving him "nowhere to go."

After that interview, Caushi filed two applications for asylum with the assistance of two different attorneys – the first in December 1999 and the second in July 2001. In an affidavit attached to both applications, he gave a far more dramatic account of his past. He claimed that he had been arrested by the police and "beaten constantly" for two weeks in 1989, and again in 1998. During both detentions, Caushi now said, the police (then controlled by the Serbs) tried to recruit him as an informant against the Albanian resistance, but he refused. His stated reason for leaving Albania was, according to the affidavit, his unwillingness to fight in the Serb army. He feared returning, he claimed, because he would be "prosecuted and persecuted" for refusing to join the Serbian army and because the French forces in Kosovo would not protect him because of their bias against Serbs. He also mentioned that he feared that he might be tortured by the KLA for refusing to join *their* army. This was his first mention of the KLA; he gave no details about the circumstances surrounding his refusal to join or why he feared retribution.

In February 2002, one year prior to his asylum hearing, Caushi supplemented the record yet again. He submitted a new affidavit stating that in November 1998 the KLA had kidnapped him, beat him, and "chained" him in a house for a week. The KLA then set up a false meeting of the Democratic League of Kosovo at a local café. Caushi realized that the meeting was a pretext for recruiting members for the KLA and tried to leave, but he was prevented from doing so. When it was his turn to stand up and take an oath to become a KLA soldier, Caushi refused. Instead, he shouted to the hundreds of attendees that they should cancel their memberships. The KLA members then allegedly took him to a back room and beat him severely with their fists and the butts of their guns, causing his face and his lips to bleed. They photographed him and showed the pictures to his family, demanding money in exchange for his release. Caushi stated that his father asked the KLA if he could keep the photos to use in appeals to others for financial help. According to Caushi, the family did seek assistance from others, including the Serbian police. As a result, the government discovered that the café served as headquarters for the KLA. Finally, Caushi claimed that sometime during his confinement, his father was beaten and the family's homes were burned down.

Shortly after Caushi submitted his February 2002 affidavit, he also submitted an affidavit from Dr. Bernd J. Fischer, a professor of Balkan history and chair of the Department of History at Indiana University at Fort Wayne. Fischer devoted the majority of his statement to an explanation of his concern that Serbia might regain control of Kosovo, and that Serbia had become even more nationalistic than it was in the days of Slobodan Milosevic. Fisher did, however, include a brief discussion about the KLA. He noted that although the KLA officially has disbanded, its two principal leaders play major roles in Kosovo's politics, "engage in corruption," and "in the opinion of most observers, the murder of political rivals and those ethnic Albanians who are perceived as having refused to support the KLA's guerilla war." He pointed out that former KLA members continue to play an active role in its successor organization, the Kosovo Protection Corps (KPC), which he described as a "civil defense force" that has "engaged in murder, torture, and blackmail and often targets ethnic Albanians who are perceived as having been 'soft' on Serbs." Apart from giving one example of a June 2002 arrest of six ethnic Albanians, Fischer did not explain his conclusions further or identify his sources of information. He concluded that Caushi "should fear retribution from former KLA members who believe their honor has been compromised because of his failure to support the sacred cause."

## II

In a hearing before an IJ in April 2003, Caushi, now represented by a third attorney, testified consistently with his asylum applications that he was twice arrested, jailed, and beaten for two-week periods by Serbian police in 1989 and 1998. During his first arrest, he said, police held him for two weeks and beat him with rubber

sticks, kicked him, punched him, and banged his head against the wall, causing permanent scarring on his shoulder, back, and thighs. The second time the police jailed him, they beat him daily for two weeks and kicked him repeatedly in the back of the head, causing him to suffer ongoing headaches. Caushi added that after his release the second time, he received notice from the Serbian military to report to duty. He ignored the notice, however, because he believed that he would be forced to fight for the Serbs against his own people.

Caushi also testified about his experiences at the hands of the KLA. He claimed, for the first time, that during his detention the KLA beat him daily for two months until his father paid 30,000 DM for his release. He submitted into evidence the photographs that he claimed were taken of him during the time he was held by the KLA. He testified that, unlike the records of the arrests and summons for military duty that were destroyed when his house burned, the photographs had been saved by his father, who kept them in his coat pocket because they were "dear to him." Caushi concluded by stating that he was afraid to return to Kosovo because he would be killed by members of the KLA for his refusal to join their cause.

The IJ denied Caushi's requests for asylum and withholding of removal; the judge did not rule on his claim under the CAT. The latter claim is now abandoned, however, because Caushi did not raise it either in his appeal to the BIA or in his opening brief in this court. With respect to the first two claims, the IJ accepted that Caushi's account of mistreatment, if true, might describe persecution, but he found that Caushi was not a believable witness. Among other things, the IJ cited the discrepancy between Caushi's testimony about his mistreatment by the KLA and his failure to mention that incident in his initial interview, his asylum pre-screening interview, or his two applications for asylum. The judge also found that the photographs allegedly taken by KLA members were "of questionable validity," and he found Caushi's explanation of how they survived the house burning "unconvincing."

In a one-judge order, the BIA affirmed the IJ's decision on slightly different grounds. It said that regardless of whether Caushi had testified credibly, he could not have a reasonable fear of returning to Kosovo as of August 2004 (when the BIA's order issued), because country conditions have changed fundamentally since Caushi left in January 1999. In support of its conclusion, the BIA cited the 2002 Country Report on Human Rights practices for Yugoslavia, which was before the IJ.

### III

Caushi has devoted the majority of his brief to an attack on the IJ's adverse credibility decision. This is a mistake. This court reviews only the opinion of the BIA when it issues a separate opinion that is independent of the IJ's. *Liu v. Ashcroft,* 380 F.3d 307, 311 (7th Cir. 2004). That is what the BIA did here: it relied solely on changed

country conditions in reaching its decision, and it expressly declined to address the IJ's credibility decision. We therefore consider only the BIA's reasoning, which we review under the deferential substantial evidence standard. *Ahmed v. Ashcroft,* 348 F.3d 611, 615 (7th Cir. 2003).

To qualify for asylum, Caushi was required to show that he would be persecuted if he were forced to return to his home country. It is presumed that an applicant's life or freedom would be threatened if he demonstrates that he was persecuted in the past on account of race, religion, nationality, membership in a social group, or political opinion. 8 C.F.R. § 1208.16(b)(1)(i). The government can rebut this presumption by establishing by a preponderance of the evidence that there has been a fundamental change in circumstances such that an applicant would not be persecuted if returned. 8 C.F.R. § 1208.16(b)(1)(i)(A); *Brucaj v. Ashcroft,* 381 F.3d 602, 606-07 (7th Cir. 2004).

Caushi criticizes the BIA's decision on several grounds. He claims that it failed to undertake a sufficiently detailed analysis of the alleged changes or how they would affect Caushi personally; he argues that the BIA failed to confront Dr. Fisher's opinion; and he accuses of the BIA of taking administrative notice of changes in Kosovo that were not reflected in the evidence of record. We find, however, that none of these points provides grounds for granting the petition for review.

Although this court has held that the BIA must undertake an individualized review of the applicant's case when it takes administrative notice of changed country conditions based on evidence that was not before the IJ, see *Useinovic v. INS,* 313 F.3d 1025, 1030 (7th Cir. 2002), it is unclear to what degree that rule applies when, as here, the BIA relies on evidence of record that the applicant was able to rebut. We have held, however, that the BIA need not articulate its reasons for accepting or rejecting every piece of evidence before the IJ. See *Petrovic v. INS,* 198 F.3d 1034, 1038 (7th Cir. 2000). That rule disposes of Caushi's first two points. The BIA relied on the 2002 Country Report (which was the Exhibit 12 to which it referred) for its conclusion that country conditions had changed, and that report was before the IJ. The Country Report gave no indication that the KLA had targeted Albanians who refused to serve in its ranks. The BIA had no obligation to discuss Dr. Fischer's contrary opinion, which was largely unsubstantiated and based its predictions on Caushi's likely fate on broad generalizations.

Caushi argues in his reply brief that the Country Report does not support the BIA's conclusion, but BIA was not compelled to adopt his position. Caushi points out, for example, that the Country Report states that Kosovo Albanians perceived to have cooperated with the *Serbian* authorities have been targeted for retributive violence, including killings, and that the former KLA was one group suspected of responsibility. But the BIA was not required to find that Caushi would have been perceived as one who collaborated with the Serbs, given his own assertions that he protested Milosevic's

anti-Albanian activities, defied the Serbian police's attempts to recruit him as a spy, and failed to report for duty in the Serbian army. Although the 2002 Country Report describes ongoing (though diminishing) violence involving former KLA members or KPC members, it does not document any violence perpetrated against ethnic Albanians who refused to serve in the KLA, nor does it report violence that has been ignored by the Kosovo authorities. It describes some problems from 1999, but it notes that the "small number" of killings that "might" have been politically motivated "significantly decreased" from 2001, and the victims were all in leadership positions.

## IV

Although there is more along the same lines, including indications in more recent country reports that the situation in Kosovo continues to improve, there is no need to rehearse this information in detail. It suffices for present purposes to say that the BIA's conclusion that Caushi's claim should be rejected because of a fundamental change in circumstances since he left Kosovo is supported by substantial evidence. We therefore **D**ENY the petition for review.