Ly Ying SAYAXING, Petitioner–
Appellant,

v.

IMMIGRATION AND NATURAL-
IZATION SERVICE, Respon-
dent–Appellee.

No. 98–3161.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1999.

Decided April 19, 1999.

516

Harold D. Block (argued), Milwaukee, WI, for Petitioner–Appellant.

Michelle E. Gorden (argued), Department of Justice, Civil Division, Washington, DC, for Respondent–Appellee.

Before EASTERBROOK, KANNE, and EVANS, Circuit Judges.

KANNE, Circuit Judge.

Ly Ying Sayaxing, a national and citizen of Laos, appeals the denial of his petition for asylum by the Board of Immigration Appeals ("Board"). He claims that if he is forced to return to Laos, the communist government will persecute him for his political and religious beliefs. While we sympathize with Ying's concerns, we cannot say that the Board was wrong when it concluded that he failed to demonstrate an objectively reasonable basis for his fear and, that, therefore, he had not met the requirements of demonstrating a well-founded fear requirement for asylum.

## I. History

### A. Ying's Account of His Life in Laos

Ying is a forty-two-year-old citizen of Laos. He is a member of the Hmong ethnic minority, as well as a Christian, who lived in Lienchang, Laos. In 1985, he met and became friends with Thongoouk Saysangkhy, who was then a vice minister with the transportation ministry. At the time, Ying worked as the chief of accounting for the Lao Freight Forwarding Company, one of the state-run transportation companies that Thongoouk oversaw. The two initially spoke primarily about their work, but their conversations gradually evolved into political reform discussions. By 1987 they had invited two other government officials—Rasamy Khampoui and Feng Sakchittavuy, both from the Cultural Affairs Ministry—to join in their political exchanges.

During this period, Ying's company reassigned him to work in their Da Nang, Vietnam, office as the Branch Chief. As part of his responsibilities, Ying returned to Lienchang to present monthly reports to his supervisor. These trips lasted for one to two weeks. In addition to delivering his reports, Ying continued to meet with Thongoouk, Rasamy, and Feng to discuss political reform in Laos.

In 1990, as the four had agreed, Thongoouk presented the group's ideas about reform to the national assembly. Three days later, Thongoouk, Rasamy, and Feng were arrested and charged with opposing the communist government. According to Ying, the three were detained without a trial or advice of counsel. Ying believes he escaped a similar fate only because he happened to be out of the country when the arrests occurred. The three remained in a prison camp where they were tortured until 1992. During this period, Ying continued to visit them when he returned to Laos to deliver reports to his supervisor. He also visited Thongoouk's wife and child, buying food for them or sharing meals. Rasamy died while at the camp, but Thongoouk and Feng were eventually tried, convicted, and sentenced to fourteen years imprisonment.

Each time he returned to Laos from Vietnam, Ying had to pass through a guarded border crossing. He was never stopped, arrested, interrogated, or detained during this period. He testified that he believes he was not arrested because the Lao government was attempting to build a case against him in order to link him with Thongoouk, Rasamy, and Feng.

In 1993, two to three months after the conviction of Thongoouk and Feng, Ying's company reassigned him to his former position as chief of accounting in Lienchang. Ying became concerned about his status with the government because he was told the Da Nang position was no longer needed, yet he learned that he had simply been replaced by another official. The transfer also resulted in a pay cut for Ying. In addition, his assistant, who now assumed duties that were previously assigned to the chief of accounting, reported Ying's actions to Ying's supervisors directly. During this time, he continued to live in the same home. He was neither arrested nor physically attacked. No one searched his home. And, he was never summoned for questioning. Ying contends, however, that he was being watched "very closely."

In 1994, Ying obtained a travel visa for the United States, ostensibly to visit his ill mother-in-law. Ying argues that this trip was really motivated by his fear and subsequent desire to flee Laos. Although the Lao government denied his initial application for a visa, it ultimately granted him a visa after he demonstrated proof of ownership of property and that his family would remain in Lienchang. He arrived in the United States in June 1994 with permission to stay three months from the Lao government and one year from the U.S. government.

While in the United States, Ying learned that two strangers visited his wife at their home on two separate occasions. During these visits, the men questioned her about Ying's whereabouts, when she expected him to return, and whether they were in communication with each other. After each of these visits, Ying's wife wrote to him expressing concern and fear for his safety.

Ying's wife and his children remain in Laos, where she continues to live in their family-owned home in Lienchang. In addition, Ying's eight acres of land and five fish ponds remain under his ownership. His wife and children, who attend school, have not been arrested or harmed since he left.

## B. The Immigration Proceedings

In 1996, the Immigration and Naturalization Service ("INS") issued an Order to Show Cause as to why Ying should not be deported for remaining in the United States beyond his one year allowance. Ying conceded he had stayed longer than he had been granted permission to remain and petitioned for political asylum.

After hearing Ying's testimony, the Immigration Judge ("IJ") questioned Ying's credibility. Specifically, the IJ found suspect Ying's claim that the Lao government was attempting to silence Ying but at the same time permitted him to travel between Laos and Vietnam long after it had detained Thongoouk, Rasamy, and Feng. The IJ also found that Ying's fear was based purely on speculation rather than an objectively reasonable fear.

Ying petitioned the Board, which, in turn, dismissed his appeal. The Board found that Ying had failed to demonstrate that his fear was objectively reasonable. Specifically, it found that he had failed to present evidence that the Lao government was investigating him while he was in Laos. He also did not explain why he was treated differently than Thongoouk, Rasamy, and Feng and not detained or arrested. In addition, Ying failed to explain to the Board's satisfaction why the Lao government, which supposedly suspected him of crimes similar to those for which it detained and tortured Thongoouk, Rasamy, and Feng, granted him a travel visa to the United States. It noted that the visits

by the strange men had not been adequately explained as well. Finally, the Board found the fact that his family and property had not been harmed while he was abroad undercut his contention that he would be persecuted upon his return to Laos because of his political and religious beliefs.

After this dismissal, Ying filed a motion for the Board to reopen his case and reconsider its dismissal. This motion is still pending. In addition, Ying appeals the Board's dismissal to this Court, focusing solely on the concerns raised because of his political beliefs.

## II. Analysis

### A. Standard of Review

■ In considering Ying's claims under the Immigration and Nationality Act ("Act"), we review legal questions *de novo*. *See Hartooni v. INS*, 21 F.3d 336, 340 (9th Cir.1994). We defer to the Board's factual findings, reversing the Board only if the record lacks substantial evidence to support its factual conclusions. *See Angoucheva v. INS*, 106 F.3d 781, 788 (7th Cir. 1997); *see also* 8 U.S.C. § 1105a(a)(4) (requiring appellate courts to uphold the Board's conclusions if "supported by reasonable, substantial, and probative evidence on the record as a whole"). Thus, if the Board concludes that an asylum applicant fails to present specific facts that he or she has been persecuted or has good reason to fear that he or she will be singled out for persecution in the future, we will not disturb that conclusion unless the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Angoucheva*, 106 F.3d at 788 (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)).

### B. Ying Claims He Has a Well–Founded Fear of Future Persecution

■ Under the Act, Congress authorized the Attorney General to grant asylum to aliens who are "refugees." *See* 8 U.S.C. § 1158(b). The Act defines a "refugee" as an alien who is unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Thus, asylum may be granted upon past persecution or upon a well-founded fear of future persecution. *See Iliev v. INS*, 127 F.3d 638, 642 (7th Cir.1997). The burden falls on the asylum applicant to establish that he or she is a refugee under the Act. *See Cuevas v. INS*, 43 F.3d 1167, 1170 (7th Cir.1995).

■ While the statute is silent as to what actually constitutes persecution, this Court has defined it as behavior that "threaten[s] death, imprisonment, or the infliction of substantial harm or suffering." *Sharif v. INS*, 87 F.3d 932, 935 (7th Cir. 1996). The behavior, however, does not need to be life-threatening; for example, torture and economic deprivation may also constitute persecution, if "the resulting conditions are sufficiently severe." *Id.* Similarly, we have stated that "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate" also constitutes persecution. *Cuevas*, 43 F.3d at 1170 (quoting *De Souza v. INS*, 999 F.2d 1156, 1158 (7th Cir.1993)). Conditions that affect entire populations, however, do not rise to the level of persecution contemplated by the Act. *See Sharif*, 87 F.3d at 935.

■ Although the Act provides two routes by which aliens may apply for asylum, Ying challenges the Board's decision only with regard to the well-founded fear aspect of the test. Thus, we focus our attention accordingly. To establish that he was unable to return to Laos because of a "well-founded fear of persecution," he "must demonstrate that the fear is (subjectively) genuine and that it is reasonable in light of the (objective) credible evidence." *Tzankov v. INS*, 107 F.3d 516, 519 (7th

Cir.1997) (citations omitted). Thus, an applicant must establish that his or her fear is "both subjectively real and objectively reasonable." *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir.1997).

▇▇▇ While the subjective fear component turns primarily upon the applicant's testimony and credibility, the "objective component of the test requires the applicant to 'present *specific, detailed* facts showing a good reason to fear that he or she will be singled out for persecution.'" *See Sivaainkaran v. INS*, 972 F.2d 161, 163 (7th Cir.1992) (quoting *Zulbeari v. INS*, 963 F.2d 999, 1000 (7th Cir.1992)). To state this standard in another way, the applicant must "present *specific evidence* that his encounters with the government were of such a 'magnitude and frequency' that they would cause a reasonable person to fear being singled out for persecution ... and to demonstrate that his fear of persecution pertained to him individually, rather than to the population generally." *Id.* at 165 (citations omitted). The applicant does not have to establish that he or she will definitely be persecuted if he or she returns or even show that persecution is highly likely; rather, the applicant must demonstrate that persecution is a "reasonable possibility." *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 430–31, 440, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). "One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Id.* at 431, 107 S.Ct. 1207; *see also Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir.1999).

The Board dismissed Ying's petition for appeal concluding that he had "not adequately established a well-founded fear of being persecuted by the Lao government on account of his political opinion, or for any other protected ground, when returning to his homeland." Ying challenges this conclusion on two grounds. First, Ying alleges that in reaching its decision, the Board improperly used the "clear probability" standard, which is applied to evidence of claims dealing with a withholding of deportation analysis, rather than the "reasonable probability" standard applicable to evidence presented in asylum claims. Second, he claims that the record demonstrates, contrary to the Board's conclusion, that his fear is subjectively genuine and objectively reasonable.

▇▇▇ In considering Ying's claims, we note that the Board did not specifically define the "well-founded fear" standard under which it reviewed the IJ's decision. However, it did cite two cases—*Cardoza-Fonseca* and *Mitev v. INS*, 67 F.3d 1325, 1331 (7th Cir.1995). Under *Cardoza-Fonseca*, the Supreme Court established that the standard for reviewing evidence in cases involving withholding of deportation (clear probability) and that for reviewing cases involving asylum claims (well-founded fear) were different. 480 U.S. at 440, 446, 107 S.Ct. 1207. Our decisions in *Mitev* and other cases are consistent with this conclusion and apply the well-founded fear standard as requiring a showing of a "reasonable possibility" of persecution. *See* 67 F.3d at 1331; *see also Ahmad*, 163 F.3d at 461 (citing *Cardoza–Fonseca*, 480 U.S. at 440, 107 S.Ct. 1207, for the proposition that "[a]n alien need only prove a 'reasonable possibility' of persecution to qualify for refugee status, not that persecution is more likely than not"). Nothing in the Board's opinion indicates that the Board based its conclusion on a clear probability standard rather than the reasonable possibility requirement of the well-founded fear standard. We will not speculate that it did not conform with well-established law. The Board concluded that Ying failed to present *any* specific facts to establish a well-founded fear, not that he had presented specific facts, but that they did not establish a clear probability of persecution. Thus, we find, as a matter of law, that the Board did not err in its application of the legal standard to Ying's claim.

▇▇▇ Ying also contends that the Board ignored his prominent role in developing

the proposal that Thongoouk presented to the national assembly and for which Thongoouk and the others were eventually persecuted. In reaching its decision, the Board assumed that Ying's testimony before the IJ was credible, even though the IJ had found otherwise. In doing so, it considered only whether Ying had established the objective portion of the well-founded fear analysis.

The objective requirement places the burden on the asylum applicant to present specific evidence of his or her encounters with the country's government that are of such a magnitude or frequency that these contacts create a reasonable fear that the applicant would be singled out for persecution if returned to the country. *See Sivaainkaran*, 972 F.2d at 165. Based on its findings, the Board concluded Ying had not met this standard. Specifically, the Board found that Ying presented no evidence that the Lao government investigated him from the 1990 incarceration of his fellow dissidents until he left Laos for the United States in 1994. It also found that Ying had failed to present specific evidence about how he was supervised by his assistant in Lienchang or how this assistant had reviewed Ying's activities after Ying returned from his position in Da Nang. The Board concluded this lack of detail demonstrated that Ying's concerns with regard to these matters were mere speculation. The Board also found fault with Ying's explanation regarding his contention that the Lao government was attempting to build a case against him, a low-level employee of a state-run company, while it took no such steps when it arrested, detained, and convicted three high-ranking governmental officials. The Board also was not satisfied with Ying's explanation as to why the Lao government would permit him to travel to the United States on a visitor's visa when it was supposedly trying to build a case against him. The Board also found that Ying's recall and apparent "demotion" to Lienchang were not indicative of government persecution. Neither did the Board accept that the

visits by two strange men who questioned Ying's wife, but otherwise left the family alone, were motivated by the government's desire to persecute Ying for his political views. The Board concluded that the men could have been investigating Ying's failure to return to Laos, since he had told officials he would be abroad only for three months and has remained away for a considerably longer period. Finally, the Board found that Ying's family and property had not been harmed since he had left Laos. Thus, it concluded that Ying did not establish a well-founded fear of persecution if he returned to Laos.

We agree that substantial evidence supports these findings and that Ying has not established that his stated fear of future persecution is objectively reasonable. As much as we might sympathize with his fears, the evidence does not create a reasonable possibility of persecution upon his return. This case is similar to *Zulbeari*, 963 F.2d at 1001, in which we concluded that Zulbeari had not presented "specific facts demonstrating a reasonable fear of being singled out for persecution." Zulbeari, like Ying, expressed fear of persecution because of his anti-government conversations with others who had publicly spoken against the Yugoslavian government. *Id.* at 1000. Like Ying, Zulbeari was able to leave his country for Mexico; he even obtained a passport extension through bribery. *Id.* at 1001. Zulbeari's family, like Ying's, remained in Yugoslavia unharmed. *Id.* Unlike the Lao government, the Yugoslavian government had questioned Zulbeari and allegedly slapped him during the interrogation. *Id.* If Zulbeari's assertions did not raise him to the status of a refugee under the Act, it is difficult to envision how Ying's claims could elevate him to such a status.

The evidence Ying presented, while troubling, does not rise to the level of persecution. In fact, many of his statements undercut his fear of future persecution. While he argues that the Lao gov-

ernment was trying to build a case against him, he was never arrested, detained, or even questioned. This apparent lack of overt interest by the government undercuts his contention of being the subject of an ongoing investigation. *See Mitev*, 67 F.3d at 1332 (concluding that failure to establish any encounters with government officials cuts against arguments that applicant's fear was objectively reasonable). The fact that he obtained a visa to travel to the United States also diminishes his assertions. *Cf. Sharif*, 87 F.3d at 935 (finding that applicant who traveled to United States freely and remained with the permission and assistance of the Iranian government cut against arguments that she would suffer persecution if she returned to Iran). The fact that Ying's family and property remain unmolested in Laos reduces the reasonableness of his fear as well. *See Tzankov*, 107 F.3d at 520 (upholding Board's denial of asylum noting lack of evidence indicating applicant's mother, who resided in Bulgaria and received a government pension, feared for her safety); *Sharif*, 87 F.3d at 935 (upholding Board's denial of asylum noting applicant's family lived safely in Iran); *Mitev*, 67 F.3d at 1332 (upholding Board's denial of asylum noting applicant's family was not harassed during his absence). Finally, Ying points to his "demotion" as specific evidence of the objective reasonableness of his fear. This evidence, however, does not further Ying's cause. While "[w]e may not like the idea of a government assigning careers, . . . it does not rise to the level of 'infliction of harm' directed only at [the applicant] that we [would] find 'illegitimate' [so as] to justify granting asylum." *Urukov v. INS*, 55 F.3d 222, 228 (7th Cir.1995). Ying's assertion that his job changed because of his political beliefs is mere speculation. No evidence supports Ying's conclusion that this job change was directed at him individually as a type of persecution rather than simply part of the government's allocation of jobs. Thus, while we sympathize with Ying, substantial evidence supports

the Board's conclusion that he did not establish that his fear is objectively reasonable. The evidence simply does not compel a finding that a reasonable possibility exists that Ying would face future persecution. Therefore, we agree that he failed to meet the burden necessary to state successfully his claim for asylum.

## C. Ying Challenges Errors in the IJ Hearing .

 Ying also challenges his deportation hearing as unfair because the IJ "abruptly cut [him] off mid-sentence" during his testimony regarding the State Department's Country Report on Laos that concludes repatriation of refugees into Laos is safe. He contends that this and other instances of "aggressive cross-examination" throughout the hearing made it impossible for the hearing to be fair. Ying, however, did not raise these concerns before the Board. Because he did not, we do not have jurisdiction over this claim. *See Mojsilovic v. INS*, 156 F.3d 743, 748 (7th Cir.1998). While due process claims, generally, do not require exhaustion because the Board does not have authority to adjudicate constitutional issues, applicants must raise them if their "claim[s] involve[ ] procedural errors correctable by the administrative tribunal." *Castaneda–Suarez v. INS*, 993 F.2d 142, 144 (7th Cir.1993) (internal quotation marks and citations omitted). We have held that an ineffective assistance of counsel claim that resulted from an applicant's counsel permitting the IJ to sequester the applicant during her own deportation hearing must be raised before the Board because the Board has the authority to remand such a case and require the IJ to permit the applicant to remain in the room during the entire hearing. *See Mojsilovic*, 156 F.3d at 748–49. As with an ineffective assistance of counsel claim, the Board would have had the ability correct the problems raised by Ying in this case by ordering a new hearing. This route would have enabled the Board to avoid engaging

in the adjudication of a constitutional issue, but would have permitted the correction of the potential due process error. Therefore, we conclude that Ying waived his right to present this claim to us.

 Finally, Ying contends that because the IJ made several factual mistakes in her opinion and the Board adopted some of these in its decision, this Court should reverse the Board's decision. While it is true that if the Board had relied upon these conclusions the legitimacy of the result would be questionable, we are not faced with that case. To the extent that these conclusions made by the IJ went to credibility, they were irrelevant to the Board's decision because the Board assumed for purposes of its decision that Ying's account was credible and, instead, dismissed his appeal because he failed to establish the objective reasonableness of his fear. In addition, of the misstatements Ying notes, only one—that concerning his ownership of property—was considered by the Board. Ying argues that the IJ's statements regarding Ying's property, such as the statement that "currently his family contracts with people to sell fish located in ponds on the eight acres" Ying owns, misrepresent his actual testimony and the truth. The record, however, supports these facts regarding Ying's ownership of the land. He testified that his house in Laos is owned by the family and that he owned an additional eight acres of land and five fish ponds, which he harvested through contractual arrangements with other individuals. Thus, the Board's reliance on these statements is not undermined by Ying's claims. We find no reason to reverse the Board's decision based on the alleged misstatements of the IJ and find substantial evidence to support her decision.

### III. Conclusion

Having determined that Ying failed to establish an objectively reasonable fear of future persecution, we conclude that substantial evidence supports the Board's de-termination that Ying failed to establish statutory eligibility for asylum as a refugee. In addition, we find Ying waived his challenges to his initial hearing and no merit to his claims about misstatements allegedly made by the IJ. Therefore, we AFFIRM the Board's dismissal.