In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2619

RIGOBERTO VELASQUEZ-BANEGAS,

*Petitioner*,

*v.*

LORETTA E. LYNCH, Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the Board of Immigration Appeals.
No. A206-157-231.

ARGUED DECEMBER 1, 2016 — DECIDED JANUARY 19, 2017

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The petitioner, a citizen of Honduras, entered the United States in 2005—without being authorized to do so—when he was 38 years old. He is now 49, still living in this country, still not authorized to live here. In 2014 the Department of Homeland Security began proceedings in the Immigration Court to have him removed from this country (i.e., deported) to Honduras. He applied for withholding of removal and also for protection under the

Convention Against Torture, on the ground that he is highly likely to be persecuted if returned to Honduras. The immigration judge denied both applications and ordered him removed. The Board of Immigration Appeals affirmed summarily, and he appeals to us.

In 2007 he discovered that he was HIV positive. HIV, short for human immunodeficiency virus, is treatable, but often progresses to AIDS—acquired immunodeficiency syndrome—a very serious, and though treatable often fatal, condition. In the Immigration Court the petitioner argued (and in our court continues to argue) that he is entitled to remain in the United States because of acute danger that he faces if returned to Honduras, danger resulting from the fact that a great many Hondurans believe that AIDS is an affliction of homosexuals (often it is, but not always, as so many Hondurans believe), and also that any man with HIV is also a homosexual. Most important, a great many Hondurans are hostile—often violently so—to persons they believe to be homosexual. And for cultural reasons related to Hondurans' belief about these two diseases, the medical treatment of both HIV and AIDS in Honduras is often deficient and often invasive of privacy, though poor medical service is not itself a form of persecution.

The petitioner testified without contradiction that "straight" Hondurans tend not only to despise homosexuals but also to perceive them as weaklings, and on both accounts to attack them physically. He presented evidence that many suspected homosexuals have been killed in Honduras out of sheer hatred and that the police often are complicit in, or refuse to investigate, these crimes. He testified that he's not himself a homosexual but he reminds us (as we noted in

the previous paragraph) that most Hondurans believe that
any man who has either AIDS or HIV is homosexual. He
fears that if returned to Honduras, as soon as he goes to a
hospital for treatment of his HIV he will be "outed" as a pre-
sumed homosexual. And this is true, so far as appears,
whether it is a private or a government-funded hospital—if
the latter, the "outing" of him by the hospital might well be
deemed explicit governmental persecution of presumed ho-
mosexuals.

He points out that persecution that does not result in
death or serious bodily harm is still grounds for withholding
of removal. E.g., *Stanojkova v. Holder*, 645 F.3d 943, 948 (7th
Cir. 2011); *Koval v. Gonzales*, 418 F.3d 798, 805–06 (7th Cir.
2005). As we explained in *Stanojkova*,

> Persecution involves … the use of *significant* physical
> force against a person's body, or the infliction of compara-
> ble physical harm without direct application of force (lock-
> ing a person in a cell and starving him would be an exam-
> ple), or nonphysical harm of equal gravity—that last quali-
> fication is important because refusing to allow a person to
> practice his religion is a common form of persecution even
> though the only harm it causes is psychological. Another
> example of persecution that does not involve actual physi-
> cal contact is a credible threat to inflict grave physical
> harm, as in pointing a gun at a person's head and pulling
> the trigger but unbeknownst to the victim the gun is not
> loaded. The line between harassment and persecution is
> the line between the nasty and the barbaric, or alternative-
> ly between wishing you were living in another country
> and being so desperate that you flee without any assur-
> ance of being given refuge in any other country.

Suspicion of the petitioner's being homosexual will be enhanced because, though now in his late forties, he has never married. There has always been suspicion, even in the United States, that a man who never marries may be homosexual or at least bisexual, meaning he's sexually or romantically attracted to both men and women. The suspicion does not extend to heterosexual men who have such huge sexual appetites that they are unwilling to tie themselves to one woman, in marriage, but that is not our petitioner.

There is no suggestion that as a resident of the United States all these years, albeit an unauthorized resident, the petitioner has engaged in serious criminal conduct—his entire criminal record appears to be limited to a couple of minor offenses that resulted in his being jailed for 15 days—or has posed or poses any kind of threat to the nation's health or welfare. He is, in short, harmless, and we can't understand the immigration judge's failure to take that into account in deciding whether to grant withholding of removal—also her failure to take into account the alarming and pertinent fact that Honduras has the highest crime rate in the western hemisphere. In fact, according to the U.N. Office on Drugs and Crime, Honduras has the highest homicide rate *in the world*—90.4 homicides per 100,000 people; the international average is 6.2 homicides per 100,000 people. U.N. Office on Drugs and Crime, *Global Study on Homicide 2013*, pp. 12, 24 fig.1.5, www.unodc.org/documents/gsh/pdfs/2014_GLOBAL_HOMICIDE_BOOK_web.pdf. This is a fact the immigration judge and Board of Immigration Appeals should have noted; neither did.

In fact the immigration judge made a hash of the record. A highly qualified American Ph.D. professor of Latin Amer-

ican studies, Suyapa Portillo, who specializes in the LGBTQ community (lesbian, gay, bisexual, transgender, and queer—an acronym that covers the entire spectrum of homosexual and related sexual orientations) in Honduras, testified as an expert witness for the petitioner. In the last 12 years she's visited Honduras three to four times a year to conduct research. The immigration judge qualified Dr. Portillo to testify as an expert witness regarding "the experience of LGBTQ people in Honduras" and also of "HIV-positive people" in that country—overlapping groups, obviously—and having been thus qualified Dr. Portillo testified that it's very difficult for people with HIV to find employment—employers often require proof that an applicant does not have HIV. She testified that since Honduras's 2009 coup d'état (when the Honduran Army, following orders from the Honduran Supreme Court to oust President Manuel Zelaya, sent him into exile), more than 200 LGBTQ people have been murdered according to a pattern she thought indicated an "LGBT cleansing," in which transgendered women were murdered with a single shot to the head and homosexual men tied up and mutilated. Dr. Portillo believes that the police are complicit in the murders and that laws purporting to protect LGBTQ people from assaults and murders are rarely enforced.

The immigration judge did not question the accuracy of Dr. Portillo's testimony in the slightest, yet deemed it irrelevant because it was "general"—it was about the LGBTQ community and about the typical experiences of Hondurans who have HIV rather than about the petitioner specifically. But realistically the evidence *is* specific to the petitioner because he fits the description of Hondurans who are at risk of persecution as a result of being believed (accurately or not)

to be homosexual. The immigration judge demanded evidence that he would be persecuted if returned to Honduras, but failed to consider the feasibility of her demand. The petitioner left Honduras more than a decade ago; he's hardly in a position, living in the United States, to assess the particular risk to *him* if he's deported, as compared to the average HIV sufferer in Honduras or even the average HIV sufferer in Honduras who is middle-aged yet has never married. See 8 U.S.C. §§ 1231(b)(3); 1158(b)(1)(B)(ii).

No matter; to be a member of a group that faces a high probability of persecution in a foreign country is enough to establish that he's at risk of persecution if deported to that country.

> [I]n evaluating whether it is more likely than not that the applicant's life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if: (i) The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and (ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.

8 C.F.R. § 1208.16(b)(2). That is an accurate description of this case.

It's often said that an immigrant seeking withholding of removal must prove that he or she is more likely than not to suffer persecution if deported, see, e.g., *INS v. Stevic*, 467 U.S. 407, 424 (1984), and that belief may have informed the immigration judge's insistence on proof that the petitioner *will* be persecuted if removed to Honduras. But in recent opinions we've explained that the "more likely than not test" should not be taken literally, for so taken it would mean that an applicant for withholding of removal who had a 50.1 percent probability of being persecuted (killed, let's say) if deported would be entitled to withholding of removal, but not one who had only a 50 percent probability of being killed if deported. Not only is this an absurd example of line drawing, but it assumes unrealistically that such statistics can be computed. In fact "all that can be said responsibly on the basis of actually obtainable information is that there is, or is not, a substantial risk that a given alien will be tortured if removed from the United States." *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1135–36 (7th Cir. 2015). And therefore it should be enough to entitle the applicant to withholding of removal if there is a substantial, albeit unquantifiable, probability that if deported he will be persecuted. And that is Velasquez-Banegas's situation, given Dr. Portillo's testimony—testimony accepted *in toto*, we emphasize, by the immigration judge. In the appendix to this opinion, we reprint, with slight editing, pages 5 to 7 of the immigration judge's opinion, which is where she summarizes Dr. Portillo's testimony—which, to repeat, she accepted in its entirety.

She accepted the petitioner's evidence as well as Dr. Portillo's, stating that "Having reviewed the [petitioner's] testimony and documentary submissions, I find the [petitioner] credible. His testimony is internally consistent and con-

sistent with his written statement. His testimony is also consistent with the other corroborative evidence in the record, including medical records and affidavits in support of his application." What more could be required to justify granting withholding of removal?

Dr. Portillo testified without contradiction that "people with HIV are generally considered to be LGBTQ" and that the petitioner would not "be able to hide his HIV status due to a lack of confidentiality in hospitals and the likelihood that [he] would run into someone he knew while seeking treatment." The immigration judge noted that other affidavits in the record (one by a native citizen of Honduras and another by a sociology professor who lived in Honduras for two years), stated that it is a "common belief in Honduras" that those with HIV are gay or lesbian, but this was not good enough for her because the affidavits had "cite[d] no data, reports, or examples." But Dr. Portillo's testimony *that the immigration judge had accepted as truthful* was uncontradicted *evidence*, from a qualified expert witness, that the petitioner will in all likelihood be unable to hide his HIV status and as such will be believed to be a homosexual and persecuted accordingly. Indeed he could hide it only by not seeking medical care for it, which would endanger his life.

In any event it was error for the immigration judge to suggest that the petitioner would be safe if he kept secret his HIV status. The law does not require people to hide characteristics like religion or sexual orientation, and medical conditions, such as being HIV positive. E.g., *Muhur v. Ashcroft*, 355 F.3d 958, 960–61 (7th Cir. 2004). The immigration judge implies that the petitioner would be thought to be homosexual and for that reason persecuted unless he evaded his po-

tential tormentors by pretending to be a very different per-son from what he actually is—a middle-aged HIV positive bachelor in a culture in which, should those characteristics be revealed, he would be in serious danger. The immigration judge would have sized up the danger to Velasquez-Banegas differently had she assumed the petitioner would live open-ly. Suppose a person if removed to his country of origin would be sure to be persecuted unless, by living in a cave, he avoided all contact with other persons. The next step would be to rule that no one can have a real fear of persecution be-cause if persecution looms he can avoid it by committing su-icide.

It's true, as emphasized by the immigration judge, that the petitioner if deported will be returning to the region (Comayagua, also the name of the major city in the region) where his parents and siblings live. The immigration judge thought this would protect him from the heavy crime activi-ty in the region, because he would be associating mainly with people who had known him all his life and would know he was not a homosexual. But they and others would know that he was HIV positive, which Hondurans consider a badge of homosexuality; and they might conclude that he had become a homosexual after leaving Honduras for the United States, for Hondurans also tend to believe that homo-sexuality is a lifestyle choice rather than a person's genetic destiny.

The immigration judge failed even to mention the peti-tioner's testimony that an imputation of homosexuality to him is made more likely by his being middle-aged yet never married. This omission takes on a special irony given the judge's criticism of petitioner's evidence as being too gen-

eral. Now maybe he could conceal his bachelor status, along with his HIV status, but in *Muhur v. Ashcroft*, *supra*, 355 F.3d at 960–61, we rejected the related proposition that "one is not entitled to claim asylum on the basis of religious persecution if (a big if, by the way) one can escape the notice of the persecutors by concealing one's religion." We noted that "Christians living in the Roman Empire before Constantine made Christianity the empire's official religion faced little risk of being thrown to the lions if they practiced their religion in secret; it doesn't follow that Rome didn't persecute Christians, or that a Christian who failed to conceal his faith would be punished for acting 'unreasonably.'" *Id.* The law does not take a life of stealth as its starting point.

The immigration judge thought the most severe harm that could befall Velasquez-Banegas in Honduras would be inability to receive adequate medical care. But that proposition was inconsistent with her crediting Dr. Portillo's testimony (as she did), as was the judge's further statement that Velasquez-Banegas "[had] not established that it [was] more likely than not that people [would] perceive him as LGBTQ"—though she had acknowledged that Dr. Portillo had "testified and stated in her affidavit that people with HIV are generally considered to be LGBTQ, which she attributes to a lack of information available to the public. She also testified that *she does not believe that the petitioner would be able to hide his HIV status* due to a lack of confidentiality in hospitals and the likelihood that the petitioner would run into someone he knew while seeking treatment. She also discussed a personal experience where she was extorted by police officers while on her way to a gay bar with friends who were members of the LGBTQ community. Three other affidavits in the record state generally that it is a common belief

in Honduras that those with HIV are gay or lesbian, but cite no data, reports, or examples. … However, this evidence is insufficient to establish that the petitioner will likely have homosexuality imputed to him in Honduras, as it [this evidence] is general in nature, lacks objective data, and is not specific to the [petitioner]." What can the immigration judge have meant by that last sentence? The evidence, which certainly supports the proposition that Velasquez-Banegas is likely to have homosexuality imputed to him in Honduras if he's deported, is "general" because there is more than one person in Honduras with HIV, and is specific to the petitioner because he fits the description of Hondurans at risk of persecution because believed (accurately or not) to be homosexual. The judge also said, contradicting her crediting Dr. Portillo's testimony (see Appendix below), that Portillo's testimony that people in Honduras are uninformed and therefore tend to link homosexuality to HIV was not based on any report or evidence. It was based on her testimony, which was evidence—uncontradicted evidence!

We have noted repeatedly that remand may be warranted when the agency overlooks key aspects of an asylum-seeker's claim and might reach a different conclusion after fuller evaluation of the record. See *Chen v. Holder*, 604 F.3d 324, 330 (7th Cir. 2010); *Gomes v. Gonzales*, 473 F.3d 746, 752 (7th Cir. 2007); *Chitay–Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir. 1999). This is such a case. We therefore vacate the decisions of the Board and the immigration judge and remand the case for reconsideration in light of the analysis in this opinion.

**APPENDIX (QUOTED FROM THE IMMIGRATION JUDGE'S OPINION)**

Dr. Portillo testified that people with HIV, like the petitioner, are particularly vulnerable in Honduras. It is very difficult for such people to gain employment, because employers, particularly in the factory industry, require potential employees to present proof of a negative HIV test before being hired. Although this is illegal in Honduras, many private companies continue the practice with impunity.

Honduras has a socialized health care system, but those with money often use private doctors because of their superior quality and efficiency. She believes that private market care in Honduras is very expensive. She testified that hospitals often run out of medications, including HIV medication, which forces people to resort to self-medication or buying those medications in the private sector. She believes that the public health system's problems stem from a military coup in 2009, which led to increased debt and corruption for the country. She testified that there are major hospitals and non-profit organizations who give medical care in the big cities in Honduras, but those who live in rural areas have to take a bus trip, often four to five hours long, to the city, where they must wait hours at the clinic for care. Also, the buses often do not run at night because of safety concerns. Dr. Portillo is not familiar with the particular medications that HIV patients take, and she has not studied or worked with doctors who treat patients with HIV.

She described her research regarding HIV testing in San Pedro Sula, Honduras, in 2006. She first went to a Red Cross clinic to be tested for the virus, which cost five hundred Lempira, and took two weeks to get results. She returned two weeks after her test to receive her results, and the nurses at the clinic gave her the results in front of everyone in the waiting room. She took a second HIV test at an Evangelical Church organization. The intake form there asked about sexual orientation, and she identified herself as bi-

sexual. While she was waiting for the results of the test, the clinic displayed videos and pamphlets about God and abstinence outside of marriage. After receiving her results, she was counseled on God and family. She received no information about prevention or what to do if she was HIV-positive. Finally, she went to a LGBTQ organization for testing, which she described as the "best experience." But such organizations are not funded on an ongoing basis and she does not know whether the organization still exists. After she received her results from all three clinics, she was given a card displaying her results, presumably to present to potential employers. She has not updated her research regarding current tests or procedures for HIV testing in Honduras since 2006.

Dr. Portillo remained in San Pedro Sula, Honduras, for two months after completing her HIV testing research before traveling to other parts of the country. She was not physically harmed or threatened during this time, though she did take daily precautions. However, five months later, she returned to San Pedro Sula and went out to a gay bar with friends who were members of the LGBTQ community. They were stopped by police for a driving violation and harassed because of their gender identity. Dr. Portillo told the police officers that she was a US citizen and that this behavior was inappropriate, which led to the police taking one of her friends and telling the rest of the group to follow them. The police led them to a dark area in the city, and demanded money in exchange for releasing her friend, to which Dr. Portillo agreed. She believes that she was extorted because of her claim to U.S. citizenship and the assumption that as such she carried money on her.

She testified that many Hondurans directly link the HIV virus to the LGBTQ community. She believes that this is the result of a dearth of education both in the public school system and the public generally. Most HIV-positive people she has interviewed in Honduras are afraid to come out because they fear the reaction of their family, friends, and community, and because they fear losing

their jobs. She testified that she does not believe it is possible for people to hide their HIV status in Honduras successfully because the confidentiality laws for medical providers are different from what they are in the United States, the cities are small, they may run into people they know, and many are required to seek help from LGBTQ organizations and may be seen there.

Dr. Portillo also discussed the homophobic nature of Honduran society. Since 2009, more than 200 LGBTQ people have been murdered, often in a particularly gruesome manner that she believes indicates they were targeted due to their gender identity. She testified that people defecated in front of the building of a LGBTQ organization where she worked, and they also spray-painted the building. Those who work for such organizations take precautions daily to avoid harassment. She also witnessed a large protest in Honduras regarding the government's granting "non-profit status" to a LGBTQ group, which Ms. Portillo described as the largest protest she has ever seen. She also believes the police are complicit in the harassment, assault, and murder of members of the LGBTQ community, and that they rarely conduct fair investigations of such crimes. She discussed one case in which a transgender person was assaulted, on camera, and the footage showed police officers watching and laughing. Although the police officers involved were taken off active duty for a period of time, she does not believe they were prosecuted for any crimes.

According to Dr. Portillo, the Honduran constitution and criminal code have provisions intended to protect members of the LGBTQ community, but in practice these provisions are not used to protect members of the LGBTQ community or to prosecute those who discriminate or even physically assault or kill members of the community. She cited an example in which two transgender people ran for public office, and a well-known church leader made a derogatory televised speech encouraging the public to vote against them. But despite evidence of discrimination against

them, the two individuals had their lawsuit dismissed for lack of evidence.

RIPPLE, *Circuit Judge*, dissenting. I sincerely regret that I cannot join my esteemed colleagues in their disposition of this petition.

I cannot accept my colleagues' view that the immigration judge "made a hash of the record." Majority Op. at 4. The record in this case contains evidence supportive of the position of Mr. Velasquez-Banegas and evidence supportive of the position of the Government. The immigration judge carefully evaluated the entire record and determined that Mr. Velasquez-Banegas had not carried his burden of demonstrating, by a preponderance of the evidence, that he would be subject to persecution or torture if he returns to his homeland. Under well-established principles of law, our role in reviewing the immigration judge's decision is limited. We review legal conclusions de novo; however, we review factual determinations under "the deferential substantial evidence standard." *Khan v. Holder*, 766 F.3d 689, 695 (7th Cir. 2014); *Mozdzen v. Holder*, 622 F.3d 680, 683 (7th Cir. 2010). We reverse "the agency's findings only if, viewing the record as a whole, a reasonable factfinder would be compelled to reach a contrary conclusion." *Darinchuluun v. Lynch*, 804 F.3d 1208, 1214 (7th Cir. 2015) (citing 8 U.S.C. § 1252(b)(4)(B)); *see also I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Once we have determined that this deferential standard has been met, we have reached the limit of our authority. It is not within our ken to order a new trial because we believe that the evidence better supports a different conclusion.

Here, the substantial evidence test clearly has been met. Following a hearing, the immigration judge denied relief, re-

jecting both Mr. Velasquez-Banegas's claim that he faced per-secution based on his imputed sexual orientation and his claim that he would be persecuted because of his HIV status.

## A.

The immigration judge first concluded that Mr. Ve-lasquez-Banegas had not established that he was an imputed member of the LGBTQ community and therefore would suf-fer the mistreatment frequently accorded to members of that group. To support this conclusion, the immigration judge pointed to five factors that undercut Mr. Velasquez-Banegas's claim: (1) Mr. Velasquez-Banegas was not gay and did not plan to associate with the LGBTQ community in Honduras; (2) Mr. Velasquez-Banegas "testified that none of the three people he knew with HIV in Honduras were homosexual, and that neither he nor anyone else believed them to be"[1]; (3) Mr. Velasquez-Banegas likely would seek HIV treatment at a hospital located four hours away in Tegucigalpa, reduc-ing the possibility that he would see someone he knew while receiving treatment;[2] (4) Mr. Velasquez-Banegas would be re-turning to his hometown where he lived for thirty-eight years and many people who knew him before would still be living there; and (5) neither the provided articles nor the country conditions report stated that individuals who are

---

[1] A.R. at 114. The Government concedes that this was an inaccurate por-trayal of Mr. Velasquez-Banegas's testimony. Government's Br. 14 n.4. Mr. Velasquez-Banegas testified that he did not think these three people were homosexual, but he was not aware of what others thought. A.R. at 170–74.

[2] *Id.* at 114.

HIV-positive are assumed to be gay, although those documents did discuss access to HIV healthcare, the stigma associated with being HIV-positive, and the violence experienced by members of the LGBTQ community.

Next, the immigration judge addressed Mr. Velasquez-Banegas's claim that his HIV status was a protected social group. The immigration judge determined that the social group was cognizable and that Mr. Velasquez-Banegas was a member of this group. However, the immigration judge denied relief because Mr. Velasquez-Banegas had not demonstrated that it was more likely than not that his "life or freedom would be threatened" on account of his HIV status.[3] The "most severe harm" that Mr. Velasquez-Banegas would face, according to the immigration judge, was his inability to receive medical care in Honduras.[4] However, the immigration judge concluded, and my colleagues do not challenge, that the problem of inadequate medical care is not specific to those with HIV.

Regarding relief under the Convention Against Torture, the immigration judge found that Mr. Velasquez-Banegas had not established that it was more likely than not that he would be perceived as gay, although the judge recognized that the record reflects that LGBTQ people in Honduras experience persecution and "possibly torture."[5] The immigration judge added that lack of access to medical care and employment did

---

[3] *Id.* at 115.

[4] *Id.* at 116.

[5] *Id.* at 116–17.

not constitute torture. Based on these findings, the immigration judge denied Mr. Velasquez-Banegas's petition.[6]

Mr. Velasquez-Banegas first asks us to review the determination that his HIV status would not cause him to be perceived as gay. He claims that the Board disregarded relevant evidence and also impermissibly reasoned that others would not perceive Mr. Velasquez-Banegas as gay so long as he did not disclose his HIV status.[7]

There can be no doubt that Mr. Velasquez-Banegas presented significant evidence that gay men in Honduras face abuse, violence, and even death at the hands of the general

---

[6] Mr. Velasquez-Banegas appealed this decision to the Board of Immigration Appeals ("the Board"). There, he argued that the immigration judge erred in (1) finding that he would not be perceived as gay; (2) improperly concluding that Mr. Velasquez-Banegas could hide his HIV status; and (3) discounting evidence as too generalized to support his claims. Finally, he alleged that he had met his burden of proof for protection under the Convention Against Torture.

On July 1, 2015, the Board adopted and affirmed the immigration judge's decision. Because the Board summarily affirmed the immigration judge's opinion, we base our review on the immigration judge's analysis. *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004).

[7] The Board has recognized explicitly that homosexuality qualifies as a "particular social group." *Moab v. Gonzales*, 500 F.3d 656, 661 n.2 (7th Cir. 2007). The immigration judge noted that imputation may or may not apply to claims of membership in particular social groups. A.R. at 114. Assuming without deciding this issue, the immigration judge proceeded under the assumption that relief could be granted on this ground. *Id.* We have held that a petitioner can state an imputed claim where he shows that others will attribute a political opinion to him and will persecute him on that basis. *See Chen v. Holder*, 604 F.3d 324, 332 (7th Cir. 2010).

public, as well as at the hands of the police force.[8] Indeed, the immigration judge concluded that "LGBTQ individuals in Honduras may face persecution, and possibly torture."[9] However, the immigration judge also found that Mr. Velasquez-Banegas had not shown that he would be perceived as gay based on his HIV-positive status.

Mr. Velasquez-Banegas submits that the immigration judge erred by discounting evidence merely because it was general in nature. Specifically, he claims that the immigration judge "faulted the testimony and affidavits in the record for only 'generally' stating that there is a 'common belief in Honduras that those with HIV are gay or lesbian,' and for citing 'no data, reports, or examples.'"[10] The relevant part of the immigration judge's opinion states:

> The record also contains some evidence that those with HIV are at times assumed to be a member of the LGBTQ community, and the respondent expressed this fear in his testimony. *See* Ex. 3. The respondent's expert witness, Ms. Portillo, testified and stated in her affidavit that people with HIV are generally considered to be LGBTQ, which she attributes to a lack of information available to the public. She also testified that she does not believe that the respondent would be able to hide his HIV status due to a lack of confidentiality in hospitals and the

---

[8] *See, e.g.*, A.R. at 415–16, 486–87, 489, 521–24, 529–30, 537–46, 559.

[9] *Id.* at 117.

[10] Pet'r's Br. 17 (quoting A.R. at 17).

likelihood that the respondent would run into someone he knew while seeking treatment. She also discussed a personal experience where she was extorted by police officers while on her way to a gay bar with friends who were members of the LGBTQ community. Three other affidavits in the record state generally that it is a common belief in Honduras that those with HIV are gay or lesbian, but cite no data, reports, or examples. *See* Ex. 3, Tabs B, E, and F.

However, this evidence is insufficient to establish that the respondent will likely have homosexuality imputed to him in Honduras, as it is general in nature, lacks objective data, and is not specific to the respondent.[11]

First, it is important to note that the immigration judge considered the entire record, including "general" evidence. The judge found the general evidence to be unpersuasive and did not give very much weight to it. While Ms. Portillo, petitioner's expert, had testified that people in Honduras are uninformed and therefore tend to link homosexuality to HIV, the judge noted that this statement was not based on any report or evidence. Instead, the expert could only support a related point; namely, that "there is considerable overlap between the two groups."[12] Similarly, the country report only

---

[11] A.R. at 114.

[12] *Id.* at 398 ("Exhibit D") ("To be precise, in 2005 UNAIDS estimated that 13% of men who have sex with men were living with AIDS. SHADOW REPORT at page 5."). The other evidence fell short for the same reason.

supported the notion that the HIV/AIDS epidemic "is still concentrated in high-risk groups such as commercial sex workers and their clients, men who have sex with men, [and] prisoners … ."[13] It did not expand on whether Hondurans likely would assume that all HIV-positive men shared a particular sexual orientation. Indeed, the report could be interpreted as cutting against this view. It listed "Vulnerable Groups" as including "Men who Have Sex with Men," as well as "Sex workers," "Prisoners," "Women," "Vulnerable Youth," "Orphans," "Military," "Migrant Groups and Mobile Populations in Affected Regions," and "Indigenous Groups and Descendants of African Origin."[14] According to the coun-

---

Exhibit E states "[p]ersecution extends to those individuals who are perceived as gay due to their HIV/AIDS status. The epidemic is concentrated within gay men. As a result, HIV/AIDS is perceived to be a disease 'caused' by LGBT individuals. Heterosexual males who have HIV/AIDS are often believed to be gay, and thus face the same risks of harm as gay individuals. In turn, LGBT individuals are often thought to have HIV/AIDS. As such, LGBT individuals and those with HIV/AIDS face persecution based on both homophobia and AIDS-phobia." *Id.* at 415. The exhibit, however, cites no support for this conclusion. Similarly, Exhibit F states "[t]he common myth surrounding those infected with HIV is that the person is gay or they engaged in some homosexual activity," but again does not support this conclusion. *Id.* at 431. Most unpersuasively, Exhibit B states "[i]n Honduras, there are a lot of people who link HIV to being gay. I know that the two are not necessarily connected because I know that Miguel was not gay, and I know that Rigoberto is not gay. But in my country, a lot of people assume that the two things are linked together," immediately after discussing a heterosexual man dying from AIDS and rumors that he had infected another woman. *Id.* at 390.

[13] *Id.* at 303.

[14] *Id.* at 310–12.

try report, all of these groups face an increased risk of exposure. It certainly was well within the discretion of the immigration judge to determine the weight that ought to be given to particular evidence. *See* 8 U.S.C. § 1158(b)(1)(B)(ii).

My colleagues also suggest that the immigration judge committed legal error in requiring evidence more specific to Mr. Velasquez-Banegas. They take the view that it is enough to be a member of a cognizable group that faces a high probability of persecution. Majority Op. at 6 (citing 8 C.F.R. § 1208.16(b)(2)). It is true that the general rule is that membership in a cognizable social group whose members are exposed to a high probability of persecution is sufficient to make out a case for withholding of removal. But that general rule assumes that it has been established that the applicant is in fact a member of the group. *See* 8 C.F.R. § 1208.16(b)(2)(ii). Here, no one maintains that Mr. Velasquez-Banegas is gay; in fact, he vigorously denies that he is and has stated that he has no plans to associate with the gay community, given his antipathy toward the group. His inclusion in the group therefore depends on establishing an imputed identification with that group, and, on that question, we already have acknowledged the necessity to examine the surrounding circumstances that might establish such an imputation, including the circumstances of the particular case. *See Chen v. Holder*, 604 F.3d 324, 332–33 (7th Cir. 2010).

Mr. Velasquez-Banegas seems to recognize the appropriateness of weighing evidence specific to him because he also contends that the immigration judge erred in failing to con-

sider "one of the most important pieces of *particularized* evidence he offered."[15] Mr. Velasquez-Banegas explained that, in addition to being HIV-positive, he has "never gotten married," and currently is middle-aged and single.[16] He asserts that this increases the particularized risk that others will assume he is gay once they learn he has HIV. He claims that because the immigration judge did not cite specifically this evidence in her opinion, her entire determination is void.

As I have noted earlier, the immigration judge did consider particularized evidence about Mr. Velasquez-Banegas, including that:

> the respondent will be returning to a country, and region, that he has lived in for thirty-eight out of his forty-seven years of life. His parents and siblings live in Comayagua, where he plans to return, and it is likely that many people who knew him before his departure from Honduras are still living there, … . Thus, the respondent will likely be living with people who have known him for the majority of his life and are unlikely to impute homosexuality to him, should they find out he is HIV-positive.[17]

While the immigration judge's opinion may have been clearer if it had stated that these findings directly overcame other "particularized" evidence about Mr. Velasquez-Banegas, including his age and marital status, that inference reasonably

---

[15] Pet'r's Br. 24–25 (emphasis in original).

[16] A.R. at 174.

[17] *Id.* at 114–15.

can be made from the record, and hardly warrants upsetting the immigration judge's determination. Immigration judges need only consider those issues presented and say enough for us to conclude "that [they] ha[ve] heard and thought and not merely reacted." *Solis-Chavez v. Holder*, 662 F.3d 462, 469 (7th Cir. 2011) (internal quotation marks omitted).

Finally, Mr. Velasquez-Banegas also contends that the immigration judge impermissibly reasoned that others would not perceive him as gay so long as he did not disclose his HIV status. He argues that he has a right to be open about his condition.[18] This is not an accurate characterization of the immigration judge's opinion. The immigration judge concluded that, because Mr. Velasquez-Banegas likely would seek HIV treatment at a hospital located four hours away from his hometown, this "significantly decreases the odds that he would run into someone he knows while seeking treatment."[19] Even if Mr. Velasquez-Banegas chooses to be open about his HIV status, he has not established that his HIV status will cause him to be perceived as gay. The fact that he may choose to share his status does not alter this outcome.

---

[18] *See Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011) (describing the inability to be open about membership in a protected group—their religion—as a "common form of persecution"); *Muhur v. Ashcroft*, 355 F.3d 958, 960 (7th Cir. 2004) (rejecting argument that applicant should avoid persecution by practicing religion covertly).

[19] A.R. at 114.

**B.**

The immigration judge also determined that Mr. Velasquez-Banegas had established his membership in the particular social group of HIV-positive men living in Honduras. However, she then concluded that (1) he could not show a nexus between any harm he may suffer through his membership in this group; and (2) the alleged economic and social harm, including difficulty in procuring medical treatment and obtaining employment, did not rise to the level of persecution.

Although the statute governing withholding of removal does not define "persecution," we have said that it "'must rise above mere harassment.'" *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003). More to the point, we have described persecution as including "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture," *Toptchev v. I.N.S.*, 295 F.3d 714, 720 (7th Cir. 2002), behavior that threatens the same, and "non-life-threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe," *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004) (citing *Sayaxing v. I.N.S.*, 179 F.3d 515, 519 (7th Cir. 1999)). However, "generalized conditions of hardship which affect entire populations do not rise to the level of persecution." *Id.*; *see also Musabelliu v. Gonzales*, 442 F.3d 991, 994 (7th Cir. 2006) ("Asylum is not a form of unemployment compensation.").[20]

---

[20] Mr. Velasquez-Banegas repeatedly cites reports showing that police officers and private citizens have targeted LGBTQ individuals in Honduras.

Mr. Velasquez-Banegas claims that the immigration judge ignored evidence related to the poor medical care and economic deprivation that HIV-positive individuals face. Mr. Velasquez-Banegas also claims the immigration judge gave too much weight to the fact that the Honduran government has enacted laws prohibiting the discriminatory practices which Mr. Velasquez-Banegas fears.

Regarding potential economic deprivation, the immigration judge acknowledged:

> The record shows that the respondent will face some harm in Honduras on account of his HIV-positive status, including employment discrimination, welfare discrimination, social stigma, and difficulty obtaining medical treatment for HIV. *See* Ex. 3, Tabs G–O. The respondent's expert witness, Ms. Portillo, testified that those with HIV in Honduras are frequently denied employment opportunities, particularly in the factory industry, as they are required to provide proof that they do not have the virus before being hired.[21]

Despite this evidence, the immigration judge determined that Mr. Velasquez-Banegas had not met his burden of establishing economically based persecution. The judge cited specific evidence in making this finding, including that the Honduran

---

But, as noted above, Mr. Velasquez-Banegas failed to connect his HIV status with imputed sexual orientation. We therefore cannot consider the possibility of violence facing LBGTQ persons within the merits of his persecution claim based solely on his HIV status.

[21] *Id.* at 115.

government has prohibited companies from denying or terminating employment due to HIV status. Additionally, the immigration judge noted that Mr. Velasquez-Banegas's expert, Ms. Portillo, only testified that the factory industry still conducted HIV tests and "was not aware of other industries in the country that refuse employment due to HIV status."[22] The immigration judge found these deficiencies significant because Mr. Velasquez-Banegas did not have a history of factory work. He had grown up on a ranch in Honduras, worked on a horse ranch in Kentucky,[23] and also worked on a tobacco farm.[24] The immigration judge therefore concluded that Mr. Velasquez-Banegas did not establish that he would be unable to secure the type of employment that he would be most likely to seek in Honduras.[25]

Finally, the immigration judge determined that, although Mr. Velasquez-Banegas may experience difficulty obtaining HIV treatment and medication, this difficulty was due to general country conditions that make it difficult for all Hondu-

---

[22] *Id.* at 116.

[23] *Id.* at 377–79.

[24] *Id.* at 382.

[25] *See, e.g.*, *Medhin v. Ashcroft*, 350 F.3d 685, 689 (7th Cir. 2003) (petitioner's alleged loss of one job due to his ethnicity was at most, discrimination but not persecution); *Zalega v. I.N.S.*, 916 F.2d 1257, 1260 (7th Cir. 1990) ("Although [the petitioner] complained that he could not get a government job commensurate with his education and training and that he could not obtain additional land to expand his fox farm, the economic disadvantage [the petitioner] suffered was minor.").

rans to receive proper medical care. Additionally, the immigration judge noted "that the Honduran Government has passed legislation that establishes the right to medical care for people with HIV."[26] Honduras also has a socialized medical system, low-cost hospital care for those with HIV (in cities), and "at least thirty[-]seven" HIV treatment centers in the country.[27] The immigration judge was certainly entitled to credit this evidence and come to the conclusion that any economic deprivation that Mr. Velasquez-Banegas might encounter would not rise to the level of persecution. I do not understand my colleagues to disagree with that determination.

Immigration cases always pose a special burden on United States judges. As Jacques Maritain so eloquently put it: "We are all wounded souls." *See Jacques Maritain, Réflexions sur l'Amerique* 87–91 (1958). Every American, including every United States judge, has a family memory that includes ancestors who came from some place where life was not as good as it is here. The DNA of our national character makes it very difficult to tell an individual that he cannot enjoy the same liberty, safety, and security that we enjoy. When the individual suffers from a medical condition that cannot be treated as well in the country to which he is returned, basic humanitarian values make the task even more difficult. No doubt, those who must make necessary policy choices and those who must enforce those choices feel, or should feel, that same angst. But immigration must be regulated, and, in this Country, national policy is set by Congress and enforced by the Executive. Our

---

[26] A.R. at 116.

[27] *Id.*

own task as judges is limited. Because the immigration judge's determinations were supported by substantial evidence, I respectfully dissent.